KEITZ *v.* NATIONAL PAVING AND CON-TRACTING COMPANY ET AL.

[No. 242, October Term, 1956.]

482

*Original opinion filed July 30, 1957.*

*Reargument ordered on question of negligence and amount of damages July 30, 1957.*

*Motion for rehearing on question of master and servant relationship filed by appellee August 21, 1957, denied September 17, 1957.*

*Opinion After Reargument filed November 12, 1957.*

*Dissenting Opinion After Reargument filed November 15, 1957.*

The cause was argued and reargued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Everett L. Buckmaster* (on both arguments) and *George L. Clarke* (on the original argument), with whom were *George W. White, Jr.,* and *Buckmaster, White, Mindel & Clarke* on the brief, for the appellant.

*Franklin G. Allen* (on the original argument) and *Jesse Slingluff, Jr.,* (on the reargument), with whom were *Piper & Marbury* on the brief, for the National Paving and Contracting Company, appellee.

PRESCOTT, J., delivered the opinion of the Court.

Ernest H. Keitz brought suit in the Court of Common Pleas of Baltimore City for injuries he received when the bus he was operating collided with a dump truck operated by Lloyd Ogle. He named as defendants: Ogle; Elizabeth May Sudbrook, who was the owner of the truck operated by Ogle and his general employer; Redmond Sudbrook, the son of

Elizabeth May Sudbrook, who managed her trucking business; and the National Paving and Contracting Company (National), the company for which the truck was hauling at the time of the accident. The trial judge directed a verdict in favor of Redmond Sudbrook and National, and the jury returned a verdict for the sum of $70,000 in favor of the plaintiff against the defendants Ogle and Elizabeth May Sudbrook (Sudbrook). It is from these three judgments that the plaintiff below—the appellant here—has appealed.

On July 25, 1955, at about 10:10 in the morning on a clear day, a dump truck owned by Sudbrook and being driven by Ogle in a southerly direction on Pimlico Road north of its intersection with Greenspring Avenue, in Baltimore, crossed over to the left of the center of the road and crashed head on into a bus owned by the Baltimore Transit Company and operated by its driver, Keitz, in a northerly direction on Pimlico Road. Keitz was severely hurt in the mishap and suffered injuries which required the amputation of his left leg below the knee. Ogle admitted that Keitz's bus was entirely on its own side of the road, that Keitz did not have one thing to do with the accident except that he happened to be unfortunate enough to be there, and that at the point of the accident, Keitz had gotten as far off on his own side of the road as he could get.

On the morning of the accident, Ogle was informed by Melvin Campbell, one of Sudbrook's mechanics, that National wanted a load of limestone or filler dust from Harry T. Campbell, Texas, Maryland. Ogle picked up 17,500 pounds of the material at Campbell's and was hauling it to National when the accident occurred. When he picked up the load, he receipted for it by signing his own name on National's behalf on a ticket or slip made out to National. Limestone or filler dust is powdery and because it shifts like water, especially when brakes are applied suddenly, it is called a "wet load." A shift in the load could throw the truck out of control, Ogle stated, and although he admitted that it did shift on this occasion when he applied his brakes, he testified that this had nothing to do with the accident.

National was in the business of manufacturing asphalt pav-

ing material at 4200 Menlo Drive, Baltimore, Maryland, where it operated an asphalt mixing plant and maintained road equipment which was parked there, trucks and the "usual contractor's manufacturing equipment". In connection with its business, National operated thirteen to fifteen trucks of which eight were dump trucks. Its fleet of dump trucks and drivers was wholly inadequate for its needs and, except when its business was closed down because of the weather from November to March or April, it was forced to hire additional dump trucks and drivers daily from Sudbrook. In 1955, all of National's additional trucks and drivers were furnished by Sudbrook.

The five trucks hired from Sudbrook were owned by Mrs. Sudbrook, who took over the business previously operated by her husband before his death in October, 1946. Although Mrs. Sudbrook kept the books of her business, she entrusted its active management to her son, Redmond. While Sudbrook furnished trucks and drivers to a few other concerns to haul materials required in their businesses, Sudbrook's principal patron was National and in 1955, as in 1946 when Sudbrook took over the business, National was responsible for about 80% of Sudbrook's business.

In addition to furnishing trucks and drivers to National since 1946, Sudbrook sent men to fill various jobs for National, such as a shovel or roller operator, or to take the places of absent employees whenever National needed them. Between November 20 and December 15, 1955, Sudbrook had two men there "pretty near steady" until the plant shut down. Redmond himself repaired National's trucks and equipment, went out on call if National's trucks broke down and ordered required parts for National's account. National and Sudbrook also agreed that Sudbrook's trucks, at least when being used by National in its business, should have metal signs affixed to the sides of the dump trucks bearing National's eagle emblem and name.

National's business dealings were carried on with Sudbrook with close and friendly informality and while there was no written contract between them, they did have certain verbal agreements which they both adhered to in their business deal-

ings together. In the oral agreement that they made at the beginning of each year, it was agreed that Sudbrook was to be responsible for furnishing the additional dump trucks needed daily by National and, at the same time, the parties also set tonnage prices for the year for hauls into National's plant from "Linthicum, Campbell's and Masonville".

Arrangements for each day's work were usually made between four and five o'clock in the evening when Redmond either telephoned or walked the short distance between their premises. When National hired the trucks, it was not for a particular job but by the day. If they were hauling by the hour, National paid Sudbrook by the hour, and if by the ton, Sudbrook was paid by the ton. Almost every Friday, National paid Sudbrook a "substantial amount" on account and paid in full at the end of the month.

Although Sudbrook's drivers would turn over their tonnage or hourly tickets at the end of each day to Sudbrook, the men were paid by Sudbrook on a weekly salary basis, whether they worked or not. Sudbrook hired and fired her drivers, collected withholding and social security taxes from their salaries and paid for their workmen's compensation. Each driver was assigned to a particular truck, which he himself serviced at Sudbrook's premises in respect to gas, oil and water in the radiators. Ogle, it so happened, was not using his regular truck at the time of the accident but was filling in for an absent driver and had not driven the particular truck before.

After Redmond Sudbrook ascertained the number of trucks National wanted for the next day's work, he told the drivers in the evening what they were supposed to do the following morning, and if they were told to go to National or to haul asphalt for, or bring stone or dust from the quarry to, National, anyone in authority at National could tell them what to do. In fact, it was "agreed on", a "regular part of the procedure", and "by agreement" that Sudbrook's drivers were to take and obey whatever orders or instructions were given them by National's superintendents or other supervisory personnel. Ogle's own testimony in this connection was in part as follows:

"Q. During the years you were hauling into National Paving and Contracting Company's plant * * * if, for instance, you were hauling sand, and Mr. Wirtz, or one of the other superintendents of National Paving wanted to change you to hauling something else, would he give you orders what to do? A. Yes, sir.

"Q. Would you take those orders the same as the employees of National Paving and Contracting Company? A. Yes, sir.

"Q. For instance, if Wirtz said to you, I want you to stop hauling sand, go get me a load of stone, or something different than sand, did you have to call back to Mrs. Sudbrook or her son to get orders? A. No, sir.

"Q. Your understanding was you took your orders from Mr. Wirtz, is that right? A. Yes, sir.

"Q. Did anyone else over at National Paving give you orders? A. Our instructions was, when you are on trucks, your boss can't ride with you all the time, you have to take instructions from someone, and I can't bring them in a load of stone if they want a load of sand.

"Q. In other words, whatever National Paving and Contracting Company's superintendents would tell you to do, you would do, is that right? A. Yes, sir."

\* \* \*

"If Mr. Sudbrook would give me orders the evening before, say, Go to Greenspring and bring in a load of stone, I'd bring in a load of stone; and maybe they (National) wouldn't want a load of stone, they would need some other material, I'd go to Brooklyn."

\* \* \*

"I'd get my orders in the evening, after work, and, like I say, when I came in next morning, if it was changed, I'd take my orders then from either Mr.

Wirtz, or some representative from National Paving Company."

* * *

"Q. When you got into the plant of the National Paving and Contracting Company, who gave you your orders there? A. The plant superintendent, or anyone that had any authority, they'd tell us if they wanted to change us from one job to another, they just told us."

* * *

"Q. But once you reported to the National Paving in the morning, then you took your orders from the superintendent at National Paving and Contracting Company, is that right? A. Yes, sir."

* * *

"Q. And you would not have to call Redmond Sudbrook or anyone else at Sudbrook's? A. No, sir.

"Q. You would just take the orders that National Paving and Contracting gave you? A. Yes, sir.

"Q. Did you ever haul any asphalt for National Paving and Contracting? A. Yes, sir.

"Q. That would be in Sudbrook's trucks? A. Yes, sir.

"Q. Where would you haul the asphalt to? A. Wherever the job would be."

* * *

"Q. Wherever they were doing a job for the City of Baltimore? A. Yes, sir."

* * *

"Q. Suppose they weren't ready to take the load, would somebody be there to tell you what to do with it? A. Yes, sir.

"Q. Who would that be? A. The street boss.

"Q. For whom? A. National Paving and Contracting.

"Q. Did you take orders from him? A. Yes, sir."

Redmond Sudbrook confirmed Ogle's testimony, and testified:

"Q. Didn't you testify on a deposition, anyone in authority at National, had authority to tell (y)our drivers what to do? A. That's right, but they were under my instructions. I would tell the driver, regardless of who they worked for, and where they worked, they were to take orders from the people they worked for. I couldn't ride on the trucks with them.

"Q. Insofar as National Paving, leaving aside anybody else for the moment, but, as far as National Paving was concerned, throughout the years, that is the way it worked? A. That's right.

"Q. It was a regular part of your procedure? A. It's a regular part of the procedure in all the hauling business."

William R. Cavey, Jr., a former employee of Sudbrook, testified his duties in his former employment were the same as Ogle's, and he took orders in the same manner as Ogle had testified. There was also testimony that Sudbrook's trucks and drivers commingled with those in the fleet of National, and did the same work and performed the same tasks side by side. There was no contradiction of any of this testimony. It has been set out at some length because of the main question submitted for our determination.

That principal question is whether the relationship existing between Ogle and National at the time of the accident should have been submitted to the jury. The trial court concluded that it should not and, as stated above, directed a verdict in favor of National, on the ground there was no legally sufficient evidence upon which the jury could determine that Ogle was National's servant when the collision occurred. The court based its conclusion on the belief that the case of *Hood v. Azrael,* 167 Md. 641, 175 A. 666, was controlling.

Before deciding the main point, there are one or two subsidiary ones that should be briefly discussed. When a servant such as Ogle has charge of personal property that belongs to his master, while it is placed at the disposal of another

party for the performance of a given piece of work, he is presumed to remain the servant of his general employer, and some special circumstances apart from the mere fact of the hiring of the personal property must be put in evidence to overcome this presumption. *Baur v. Calic,* 166 Md. 387, 399, 171 A. 713; *Standard Oil Co. v. Anderson,* 212 U. S. 215. The jury found that Ogle was the servant of Sudbrook when the accident happened. The appellant maintains that he also was the servant of National. The question therefore arises: Can a servant have two masters, not joint employers, at one and the same time? This must be answered in the affirmative. A person may be the servant of two masters, not joint employers, at one time as to one act, provided that the service to one does not involve abandonment of the service to the other. *Baur v. Calic, supra; Rest. Agency,* sec. 226; *Kimble v. Wilson* (Pa.), 42 A. 2d 526, 531.

Coming now to the main question involved herein, it has been stated by this Court that there are at least five *criteria* that may be considered in determining the question whether the relationship of master and servant exists. These are: (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is a part of the regular business of the employer. Standing alone, none of these *indicia,* excepting (4), seems controlling in the determination as to whether such relationship exists. The decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.* It will be noted from the above, it is not the manner in which the alleged master actually exercised his authority to control and direct the action of the servant which controls, but it is his *right* to do so that is important. *Sun Cab Co. v. Powell,* 196 Md. 572, 578, 77 A. 2d 783; *Charles Freeland v. Couplin,* 211 Md. 160, 169, 170, 126 A. 2d 606.

Such cases as *Hood v. Azrael, supra,* are easily distinguishable from the one at bar. There, it was held that the bailee and driver of a truck, who was principally, but not exclusively,

employed by a coal dealer to deliver coal to customers in sacks, was an independent contractor, and not a servant of the dealer, he being paid for such service at a fixed rate per ton, employing his own helpers, and having entire control of the manner of making deliveries, the only requirement being that he bring back to the dealer the money for the coal or the coal itself. In distinguishing this and similar cases, Judge Henderson, speaking for this Court in *Maryland Casualty Co. v. Sause,* 190 Md. 135, 140, 57 A. 2d 801, said: "In the case at bar, we do not think the evidence is so clear as to require a finding that Comes was an independent contractor. The essential elements of choice, present in the cases of *Hood v. Azrael,* 167 Md. 641, 175 A. 666; *Washington News Company v. Satti,* 169 Md. 489, 182 A. 286; and *Henkelman[n] v. Metropolitan Life Insurance Co.,* 180 Md. 591, 26 A. 2d 418, are not present here." In the case at bar, it will be seen from the testimony quoted above, that the jury might have concluded, that National and its superintendents had an almost unlimited right to control and direct Ogle in the performance of National's work, once he had reported to National. While his principal duties involved hauling from three different sources, there is nothing in the testimony that states that it was not at liberty to require of him trips elsewhere. Sudbrook's trucks ran side by side with National's in the performance of National's business. Ogle stated that "whatever National's superintendent told (him) to do, (he) would do". This clearly seems to have permitted National a wide latitude in controlling and directing his work, such as is anticipated in the relationship of master and servant.

A case that resembles in many respects the present one is *H. E. Wolfe Const. Co. v. Fersner,* 58 F. 2d 27 (C. C. A. 4th), in which Judge Soper wrote the opinion. In that case, the evidence disclosed that a subcontractor owned a fleet of eight trucks and furnished them with drivers to a construction company to haul paving materials to a point of paving on the highway, and that he paid the drivers wages and exercised the right to discharge them. It further appeared, however, that the construction company also owned a fleet of trucks used for hauling side by side with those of the sub-

contractor, and both sets of trucks were subject to the same direction and control by construction company's superintendent as to loading and unloading and also as to hauling. During the course of the opinion, the Court said:

> "In the pending case, the arrangement between the parties involved, not merely supervision by the construction company (the contractor) at each end of the haul of the loading and unloading of the trucks, but also general direction over the hauling; and when it is borne in mind that the trucks of the company and those of Gresham (the subcontractor) were used in precisely the same manner, and that both sets of trucks were subject to the same direction and control, it is obvious that the company acquired an authority over the actions of Gresham's drivers incompatible with the position of independent subcontractor on his part. * * * We think that the District Judge was justified in refusing to direct a verdict for the construction company on this ground."

As was held in that case, and as stated by Judge Henderson in *Maryland Casualty Co. v. Sause, supra,* "(w)hether the person whose immediate negligence or misconduct caused the particular injury was acting at the time as the servant of the person sought to be charged frequently depends upon such a variety of facts that it falls outside of any definite rule and for that reason becomes, under proper instructions, a question of fact for the jury". We think there was legally sufficient evidence to require the submission to the jury of the question whether Ogle was the servant of National when the accident occurred. See also, *Baur v. Calic, supra; Williams Constr. Co. v. Bohlen,* 189 Md. 576, 56 A. 2d 694.

The appellant claims that, whether or not National be liable under the doctrine of *respondeat superior,* it may not escape the consequences of allowing a truck with "bald" tires on the rear to haul tons of material that would "shift like water" in violation of the duty owed by it to the traveling public. If we assume without deciding that the evidence concerning the tires in this case were legally sufficient to raise a jury question

as to negligence and that National would be liable to the appellant even though Sudbrook were an independent contractor, there is still no evidence in the record that the condition of the tires was a proximate cause of the appellant's injuries. All actionable negligence consists of two elements: one, a negligent act or omission; and two, the negligent act or omission must cause or contribute to the injury complained of. There was therefore no error in not submitting this issue to the jury.

We are informed in the appellee's brief that if a new trial be granted that it intends to offer in evidence the fact that Mrs. Sudbrook carried automobile liability insurance on all of her trucks and her operators, and that National had no such insurance on Mrs. Sudbrook's trucks or operators. This question was submitted to, and passed upon, by the trial court; that court holding such testimony inadmissible. As the case must be remanded, we shall determine whether the ruling was correct. Maryland Rules 885. Usually, the question as to whether a party has or has not obtained insurance is immaterial. If, however, there be a legitimate purpose to be served by the introduction of such evidence, it is proper to admit the same. We think that both the fact that Mrs. Sudbrook carried liability insurance on her trucks and drivers and that National did not should have been admitted into evidence for the limited purpose of showing all the circumstances bearing upon the relationship existing between Ogle and National's servant when the collision occurred, and the jury should be so informed. *Takoma Park Bank v. Abbott,* 179 Md. 249, 262, 19 A. 2d 169; *Rhinehart v. Lemmon,* 181 Md. 663, 29 A. 2d 279; *Cushman Co. v. Smith* (Ohio App.), 1 N. E. 2d 628; *Cushman Co. v. Bernick* (Ohio App.), 8 N. E. 2d 446; *Blashfield, Cyc. of Auto. Law and Proc.,* Vol. 9C, secs. 6274, 6293.

We are also informed by the appellee's brief that in the event of a new trial, it is expected that the appellant will call Ogle and Mrs. Sudbrook as witnesses and will seek to treat them as adverse witnesses under Code (1951) Art. 35, sec. 8; and that National contends that insofar as the examinations of Ogle and Mrs. Sudbrook bear on the question as to

whether Ogle was National's servant, that they are adverse witnesses as to National and in fact are not adverse witnesses as to the appellant, and accordingly the appellant cannot, on that issue, examine either under the statute. The record fails to disclose that this matter was "presented" to the court below; consequently we are not called upon to answer it at this time. Maryland Rules 885.

As was noted at the beginning, there are three judgments upon which appeals have been taken. The one in favor of the defendant below, Redmond Sudbrook, for costs was neither argued in the appellant's brief nor orally, and may be considered as abandoned. We are requested by the appellant to affirm the judgment in his favor against Ogle and Mrs. Sudbrook, and to reverse the judgment in favor of National for costs and remand the same for a new trial on the sole issue as to whether Ogle was National's servant at the time of the accident, treating the issues of negligence and the amount of damages as *res judicata*. We have concluded that we would like that question reargued. No reason has been assigned or argued as to why the appellant's judgment against Ogle and Mrs. Sudbrook should not be affirmed. We will therefore affirm the judgments in favor of Redmond Sudbrook for costs, and the judgment in favor of the appellant against Ogle and Mrs. Sudbrook, but reverse the judgment in favor of National for costs and remand the same for a new trial when we have reached a decision after hearing the reargument upon the question mentioned above. As the other two appeals involved little if any added expense, the appellee will be directed to pay the costs.

*Judgment of Dec. 13, 1956, in favor of the appellant against Lloyd M. Ogle and Elizabeth May Sudbrook affirmed.*

*Judgment of Dec. 13, 1956, in favor of Redmond Sudbrook for court costs affirmed.*

*Judgment of Dec. 13, 1956, in favor of the National Paving and Con-*

496

*tracting Company for costs reversed, and case remanded for a new trial; the appellee to pay the costs; reargument ordered on the question of negligence and the amount of damages.*

HAMMOND, J., delivered the opinion of the Court after reargument.

The plaintiff below, Keitz, who lost a leg as the result of a collision between a bus he was driving and a truck, recovered a judgment against Ogle, the driver of the truck, and against Elizabeth May Sudbrook (hereinafter referred to as "Sudbrook") the owner of the truck. A directed verdict was granted in favor of National Paving and Contracting Company (hereinafter referred to as "National"), for whom the truck was hauling at the time of the accident. Keitz appealed, and in an opinion reported as *Keitz v. National Paving and Contracting Co.,* 214 Md. 479, 134 A. 2d 296, 303, we affirmed the judgment against Ogle and Sudbrook and reversed the judgment in favor of National, reserving for reargument one of the questions presented, as follows:

> "We are requested by the appellant to affirm the judgment in his favor against Ogle and Mrs. Sudbrook, and to reverse the judgment in favor of National for costs and remand the same for a new trial on the sole issue as to whether Ogle was National's servant at the time of the accident, treating the issues of negligence and the amount of damages as *res judicata.* We have concluded that we would like that question reargued."

Keitz sued Ogle, Sudbrook and National. National participated in the trial which was before a jury. As is often now true, as a result of discovery procedures, Keitz, the plaintiff, presented his case largely by testimony of the defendants and their witnesses. The defendants' case was offered to the jury by cross-examination of the witnesses called by the plaintiff. At the conclusion of the plaintiff's

case, National was let out on a directed verdict, and Sudbrook offered no testimony for reasons that seem apparent. Ogle, to all intents and purposes, admitted his negligence, and the circumstances were such as not to permit either refutation or minimization, or a claim of contributory negligence. The extent and duration of Keitz's injury and disability could hardly be, and were not, seriously questioned. The unfortunate man lost a leg; his earnings, life expectancy, and medical expenses were not in dispute. The only live issue in the case was the one that remains still to be answered —was Ogle a servant of National?

It is argued earnestly that upon the granting of National's motion for a directed verdict, it no longer could offer evidence or prayers, participate in the argument to the jury, or file a motion for a new trial or a *remittitur,* and it would be inherently unfair and burdensome to bind it by a judgment rendered when it was no longer in the case. It is urged that it would not be reasonable or just to require a litigant in National's position either to forego his request for a directed verdict or suffer the vicissitudes of the action. It is suggested, on the one hand, that if one so situated fails to make the motion, he may be the victim of an unjustified jury verdict and, on the other, that if he makes the motion and it be granted, his co-defendants may not adequately protect his interest.

We think the judgment against Ogle and Sudbrook should conclude National as to the issues of Ogle's negligence and the damages suffered by Keitz, and that the case should be remanded for trial on the sole issue of whether Ogle was a servant of National. *E. Coast Lines v. M. & C. C. of Baltimore,* 190 Md. 256; *C. & O. Canal Co. v. County Commissioners,* 57 Md. 201, 224-225; Maryland Rules, 315 e 3, 605 d. At common law Sudbrook and National, who were not guilty of wilful or active negligence but liable, if at all, on the doctrine of *respondeat superior,* were joint tortfeasors, each entitled potentially to contribution if Ogle was the servant of each at the time of the accident. *Restatement, Restitution,* Sec. 99, and Sec. 85, Title C, "Indemnity and Con-

498

tribution between Tortfeasors." [1]   Cases from other jurisdictions agree.[2]   Maryland might well have agreed.   *Balto. & Ohio R. Co. v. Howard County*, 113 Md. 404, 414, *et seq.; C. & O. Canal Co. v. County Commissioners, supra.*

In any event Maryland by statute has declared and amplified the common law on the subject.   Chapter 539, Laws of Maryland 1927 (Code, 1939, Art. 50, Sec. 13), provided that if judgment was recovered in tort against joint defendants, there was a right of contribution between them, and the one who paid more than his share could execute on the judgment against the others.   Chapter 344 of the Laws of Maryland 1941 (Code, 1951, Art. 50, Secs. 20-29), enacted as the law of Maryland most of the Uniform Contribution Among Tortfeasors Act.[3]   Section 20 of Art. 50 defines joint tortfeasors to be:   "* * * two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them."   Section 21 says:   "The right of contribution exists among joint tortfeasors."   Section 22 recites:   "The recovery of a judgment by the injured person against one joint tortfeasor does not discharge the other joint tortfeasor." Section 25 provides that:   "This sub-title does not impair any right of indemnity under existing law."

---

1. *Restatement, Restitution,* Sec. 99, gives the following example of the applicable law: "The A and B railroads agree to employ C as station agent at a station ·maintained by A and B jointly. While in the scope of his joint employment, C negligently injures D.   D obtains judgment against A, which A satisfies.   A is entitled to contribution from B."

2. *Bailey v. Bussing,* 28 Conn. 455; *Horbach's Administrators v. Elder,* 18 Pa. 33; *Hobbs v. Hurley* (Me.), 104 A. 815; *Grasberger v. Liebert & Obert* (Pa. Super. Ct.), 4 A. 2d 186 (reversed in 6 A. 2d 925, because the terms of the insurance policies covering the respective tortfeasors overcame the general principle).

3. Section 26 of Art. 50, as enacted in 1941, provided for third-party practice and also was the procedural replacement of the 1927 provision as to joint judgments *ex delicto,* with the right over to the payor.   Section 26 was in turn replaced by the Maryland Rules. Rule 605 d, affords the same relief as to joint judgments in tort, as did Sec. 26 of Art. 50 and Rule 315 a to f deal with third-party practice.

The potential right of contribution that each joint tortfeasor has against another constitutes him in law an indemnitee *pro tanto* and entitles him, as such, to have other joint tortfeasors, if he calls upon them to do so, participate in the defense of the law suit by the claimant or be subject to the outcome of the action just as if they had participated. *Restatement, Judgments,* Sec. 109.[4]   See also *Restatement, Restitution,* Sec. 76, Comment f; Sec. 81, Comment h; Sec. 86, Comment c, Illustration 1; *Restatement, Judgments,* Secs. 106, 107.   1 *Freeman on Judgments,* Fifth Ed., Secs. 444-450, both inclusive, agrees that the rule is well settled that one liable over in tort as indemnitor or contributor is concluded as to the right of the injured person to recover and

---

4. "In an action for contribution between two persons, where a consensual relation between them is such that each of them is entitled to contribution from the other if required to pay damages upon a claim by a third person and where the third person has obtained a valid judgment on the claim in a separate action against one of them, *both are bound as to the existence and extent of the liability of the defendant in that action,* if the person sued gave to the other reasonable notice of the action and requested the other to participate in the defense."

The comment to Sec. 109 is this: "*a.* The rule stated in this Section is based upon the principle underlying § 107 and operates under the same circumstances.   Where there is a mutual right to contribution, each person is an indemnitee pro tanto and each therefore is entitled to have the other participate in the defense or be subject to the vicissitudes of the action. The Comments on Clause (a) of § 107 are applicable. Thus, as in the case of an indemnitee, one entitled to contribution who has not notified the contributor of an action against him may be able to recover contribution for the expenses of the trial and for payment made after an unsuccessful defense if he acted in good faith, even though the contributor was not himself personally liable. As to this, see the Restatement of Restitution § 83."

Illustration 1 to Sec. 109 gives this example: "A and B jointly employ C to drive their automobile. While so driving, C harms D, who brings action against A on the ground of respondeat superior. A seasonably invites B to join him in the defense of the action but B refuses. Judgment is given against A. *This judgment is conclusive in an action by A against B for contribution.*" (All emphasis supplied.)

the amount of damages, by a judgment against the indemnitee or contributee who had notified him to defend.[5]

What the *Restatement* and *Freeman* have agreed on is sometimes referred to as "vouching in" one who is liable in whole or in part to an original defendant. Under very ancient practice, a warrantor of title to property could be brought in as a party to defend by a special writ for the purpose, the writ of voucher. *2 Pollock & Maitland, History of English Law,* Second Ed., Note p. 71, and pages 158-163, 209, 662, 664. In cases where the writ was not allowable, by analogy the judgment was made binding on the party responsible over if notice to defend was given. The practice of making notified parties responsible over concluded by the judgment has been part of the common law for centuries. It has been held to be the law of Maryland. *C. & O. Canal Co. v. County Commissioners; Balto. & Ohio R. Co. v. Howard County,* both *supra.* Illustrative of the application of the principle are the opinions in *Washington Gas Light Co. v. District of Columbia,* 161 U. S. 316, 329, 330, 40 L. Ed. 712, 719-720; *City of Waterbury v. Clark* (Conn.), 99 A. 578, 579; and *State Bank v. American Surety Co.* (Minn.), 288 N. W. 7. In 40 L. R. A. (N. S.) 1172, there

5. In Sec. 447, the author says "It is now a well-settled general rule that persons liable over to or bound to indemnify others are, as to the indemnitee, in the absence of fraud or collusion, concluded by a judgment against the latter, where they had notice of the litigation and an adequate opportunity to defend the action, even though they did not in fact do so, and independent of any contract making the judgment conclusive." Sec. 450 says in part: "The action for indemnity is obviously a different cause of action from the one in which judgment causing the loss was rendered; consequently the adjudication is conclusive only as to those matters which were actually litigated and determined. * * * But the judgment is nevertheless conclusive as to all matters necessarily adjudicated by it. Thus where two persons are, as to the injured party, joint tortfeasors, but as between themselves one is entitled to *contribution* or indemnity, a judgment against him, after proper notice to the other, is *conclusive* on the latter as to matters essential to plaintiff's recovery in the first action on the case as there presented, including the absence of contributory negligence and *the amount of the damage.*" (Emphasis supplied.)

is an annotation of cases on the subject. Examples of cases holding that the judgment is conclusive as to the fact that the damage was suffered as a result of negligence are collected on pages 1174 and 1175, and the cases holding that the damages are fixed by the amount of the first judgment are collected on pages 1175 and 1176.

As must be obvious, it is held that if one liable over actually participates in the trial, he is concluded by a judgment against the original defendant as to liability and amount of damages, even though he does not become a party of record. This is flatly held by *C. & O. Canal Co. v. County Commissioners, supra,* at pages 224-225 of 57 Md. See too *Washington Gas Light Co. v. District of Columbia, supra; Hoskins v. Hotel Randolph Co.* (Iowa), 211 N. W. 423; *Masters v. Pardue* (Ga. App.), 86 S. E. 2d 704; *Lowrance Buick Company v. Mullinax* (Ga. App.), 87 S. E. 2d 412, 414. *Restatement, Restitution,* and *Restatement, Judgments,* make it apparent that if the person responsible over is duly notified the result is the same whether he appears or not.[6]

It is apparent also that it matters not on the conclusiveness of the claimant's right to recover and the amount of damages whether one sought to be held as an indemnitor or as a contributor is vouched in by notice, is sued originally by the plaintiff as a co-defendant, or is impleaded under third-party practice by an original defendant. *O'Keefe v. Baltimore Transit Co.,* 201 Md. 345; Maryland Rule 315 a to f inclusive, and particularly Rule 315 e 3. See *"Contribution— Methods of Enforcing,"* 14 Md. L. R. 97; 39 *Am. Jur., Parties,* Secs. 90, 91; *"Indemnity between Negligent Tortfeasors: A Proposed Rationale",* 37 Iowa L. R. 517, at 553, *et seq.; "Procedural Aspects of Securing Tort Contribution in the Injured Plaintiff's Action",* 47 Harvard L. R. 209; *Wendell Allen, "Joint Tortfeasors; Contribution; Indemnity; Procedure",* Daily Record, June 7, 1948. There

---

6. *Restitution,* Sec. 76, Comment f; Sec. 81, Comment h; Sec. 86, Comment c; *Judgments,* Sec. 106, pages 505-509; Sec. 107, pages 511-517, all referred to above. See also *Notes of Seavey and Scott to Restatement, Restitution,* pages 102, 118.

are interesting and rewarding discussions of the philosophy and application of the rights of one tortfeasor to proceed in the same case against the other to establish the right to contribution in *Gustafson v. Johnson* (Minn.), 51 N. W. 2d 108, and *Wait v. Pierce* (Wis.), 210 N. W. 822.

Where one against whom a claim is asserted or established, seeks a right over against another as to all or part of the ultimate liability, there are two separate cases or two phases of the same case—*viz.,* the case of the claimant against him he sues originally or includes in his complaint when impleaded, and the case of the indemnitee against the alleged indemnitor, whether the posture is a separate suit after judgment by the indemnitee or is a phase of the original suit. In any posture of the second case or phase of the original case the parties are, in effect, adversary parties. *Simodejka v. Williams* (Pa.), 62 A. 2d 17. This Court has recognized and held that regardless of the vigor with which a particular defendant is proceeded against by the plaintiff and regardless of whether the plaintiff has chosen to include an impleaded third-party defendant as one against whom he asserts liability, one against whom an ultimate liability is asserted, whether an original co-defendant or an impleaded defendant, must be given an opportunity to assert his claim against the other defendants. *Stem v. Nello L. Teer,* 213 Md. 132. To this extent judicial recognition has been given to what reflection makes obvious—that joint tortfeasors, as potential indemnitees *pro tanto* with respect to each other, necessarily are adversaries. In the case before us Sudbrook made timely and formal objection to the Court letting National out.

We think that the aims and purposes of the Uniform Contribution Among Tortfeasors Act and of the Maryland Rules, the procedural adjuncts to the enforcement of the substantive right of contribution among tortfeasors—*i. e.,* to settle all issues in one suit, will best be served by making the judgment against one tortfeasor conclusive as to liability and amount on the other tortfeasor, where that other participated in the case in the manner and to the extent that National did in this case. One who is vouched in but does not participate in the trial at all is nevertheless bound as if he had been a

party of record, and we see no reason why, absent unusual circumstances, one who actually participates should not similarly be bound. National elected to leave the case at the stage it did. It could have stayed in and offered any evidence it had and made its jury argument. It decided that its position was strong and sound enough to invoke a judicial declaration that it had no liability whatever as a matter of law. As it developed, it made an incorrect appraisal. One vouched in who declines to participate may also turn out to have made a bad guess, but if he does, nevertheless, he is concluded by a judgment for the claimant. The case before us demonstrates the desirability and wisdom of doing almost always what was not done here—*i. e.,* of having the jury pass on the liability of all defendants unless non-liability as a matter of law is beyond serious doubt. If the trial court had reserved or denied National's motion and the jury had found against it, the trial court could have granted a judgment N. O. V. if he took the same view of law he did in granting the motion, and this Court, on appeal, had but to reinstate the verdict if it disagreed on the law.

The appellant here, who is the plaintiff below, does not seek a new trial against National on any issue except the agency of Ogle. That is the one issue that decides whether National was a joint tortfeasor and so an indemnitor, *pro tanto.* As we have noted, we think that any suggested loss of rights by National is largely illusory. It participated in the trial all through the taking of testimony and could have continued on until the end if it had so desired. The question of negligence is substantially conceded, and all evidence on the question of damages would seem to have been presented. There is no reason why the damages which Keitz suffered should be more or less whether Sudbrook alone is responsible for them or whether both National and Sudbrook are responsible for them. This Court is given elasticity of disposition by the Maryland Rules. Rules 871 a and 872 a and b would seem to enable the Court properly to dispose of any unusual circumstances in which the rule we here lay down might not be in the interest of justice or would work hardship or unfairness on any of the parties.

The view we take of the case is the view the Court took in *E. Coast Lines v. M. & C. C. of Baltimore, supra.* There East Coast, the original defendant in a tort action, impleaded Baltimore City as a third-party defendant. The City was let out on a directed verdict at the close of all of the evidence, and the jury found against East Coast Lines, which settled the judgment. On appeal, the judgment in favor of the City on the directed verdict was reversed. This Court held and expressly directed that on the retrial only the issue of the negligence of the City be presented to the jury and that if the jury found the City to be negligent, the court should enter judgment for contribution of one-half of the settled judgment. The amount of damages was concluded by the jury's verdict with the City, the indemnitor *pro tanto* in that posture of the case, getting its share of the benefit of the settlement effected by the East Coast Lines, the indemnitee *pro tanto.*[7] In substance that is the view the Court took in *C. & O. Canal Co. v. County Commissioners, supra,* where the indemnitor participated in the trial but was not a party of record. This result is in accord both with the principle underlying the rule as to vouching in a claimed indemnitor and the provisions of former Sec. 26 of Art. 50 of the Code, 1951, now found in Maryland Rule 315 e 3, which provides (obviously where the plaintiff has not amended against the third party) that "Unless the court orders otherwise, the adjudication of the defendant's liability to the plaintiff shall be *res adjudicata* as to the third party as well as to the plaintiff and defendant." See too *Topping v. Oshawa Street Ry. Co.,* (1931), 66 Ont. L. R. 618, 2 D. L. R. 263 (1931); *Stansel v. McIntyre* (N. C.), 74 S. E. 2d 345; and 47 Harvard L. R. 209, 221, *supra,* where there is a discussion of the precise

---

7. That the indemnitee can recover only a proper proportion of what he actually paid (and should legally have paid) is shown by *O'Keefe v. Baltimore Transit Co., supra* (voluntary settlement must be shown to be fair), and *Stem v. Nello L. Teer, supra* (judgment by consent as to amount not conclusive but only a ceiling); *Freeman, op. cit.,* Sec. 447, Note 7, p. 979, says: "The fact that the judgment was by consent does not take it out of the rule except that it is only presumptive rather than conclusive evidence."

situation that is before us and of the anomalous results that might ensue if a new trial was had on all the issues and not merely that of the liability of the potential indemnitor to the judgment debtor.

The case is remanded for trial on the single issue of whether or not Ogle was a servant of National at the time of the accident.

PRESCOTT, J., filed the following dissenting opinion after reargument.

Unfortunately I find myself unable to concur with the majority opinion filed in this case. It is one that literally will affect untold numbers of future trials. It is based entirely upon the theory of the potential right of *Sudbrook* to contribution from National; yet Sudbrook did not complain, she *did not* appeal.

Apparently the question is a novel one. It should be borne in mind that *the plaintiff below is the only party who has* taken an *appeal here.* Counsel for all parties concede they were unable to find a case on all fours with the present one, and the majority opinion does not seem to claim that it cites any on all fours with it. The nearest by analogy contained therein, *E. Coast Lines v. M. & C. C. of Baltimore,* 190 Md. 256, 58 A. 2d 290, will be fully dealt with later. I shall note in passing, however, that the question here being considered was not discussed, nor was there a single citation of authority offered thereon, in the opinion filed in that case. Surely, if such an important question, one that would control the practice of all similar cases in Maryland, were being determined (the present majority opinion contains thirteen pages and deals with this subject alone) the public and the Bar were entitled, at least, to have some discussion thereof in the opinion. Also the owner of the potential right to contribution therein *appealed* from the granting of the motion for a directed verdict.

If we assume that the plaintiff's appeal protected Sudbrook's potential right to contribution from National, the conclusion reached by the majority ruling is, in my opinion, still not right. In short, it holds that when two alleged joint

tortfeasors are sued as defendants, if one makes a motion for a directed verdict and it is granted, the one to whom the directed verdict is granted is bound, upon reversal on appeal, by the subsequent proceedings at the trial, although not permitted to participate therein. The responsibility of counsel at the trial table oftentimes is grave and weighty, and, to my mind, this ruling will add to it immeasurably. It furnishes little consolation to say that if you make a "bad guess," you and your client must suffer the "vicissitudes" of your action. Few lawyers are endowed with the powers of clairvoyancy, and litigants should not be subjected to the requirement that they rest their rights upon such powers. In fact, it is the boasted claim of the law that one of its cherished goals is a quest for certitude to eliminate "guesswork" from the administration of justice.

The basis of the ruling is the familiar and well established principle of law that in an action for *indemnity* between two persons, who stand in such a relation to each other that one of them has a duty of indemnifying the other upon a claim by a third person, if the third person has obtained a valid judgment on this claim in a *separate* action against the indemnitee, both are bound as to the extent and existence of the liability of the indemnitee, if the indemnitee gave to the indemnitor reasonable notice of the action and requested him to defend it, or participate in the defense, but the indemnitor *declined* or *failed* so to do. This has been the law for many years. With this, the text writers, the case law and *Restatement* agree, but nowhere has it yet been said that the rule applies to one who has appeared and been granted a motion for a directed verdict, or that it changes the usual and customary practice relating to such motions. However, the majority of the Court broaden this rule so as to treat a corporation, that has appeared, participated in the trial and availed itself of the customary and well-recognized methods of defense, on the same footing with a person who has *declined* or *failed* to participate in the defense. I find nothing in the authorities cited in the majority opinion, or by personal research in the statute law of this State, the Maryland Rules or authorities elsewhere that warrants such a drastic change in the long recognized

results of making a motion for a directed verdict. It is not difficult to foresee many of the dilemmas that will confront litigants and trial counsel in the future.

It may be stated here that the ruling to be suggested later would work no hardship upon, nor forfeit any of the rights, of Sudbrook in relation to her potential right to contribution from National. All that she probably was required to do in this case to protect herself was to object seasonably to the granting of National's motion for a directed verdict (which she did) and then to *note an appeal* (which she did not do). This would be certain had Sudbrook filed a cross-claim against National, objected to the granting of the directed verdict and then noted an appeal.

The majority opinion laboriously descants with quotations from the *Restatement of the Law.* I am in full accord with the principles enunciated by the *Restatement,* but, after a careful reading of all of the sections named, I fail to discover their *applicability* to the facts of this case. It seems significant that while the *Restatement* has been published for quite a number of years, there is not a single reference in the opinion to any case from anywhere that has applied the quoted principles to a factual situation such as the one involved herein.

I shall not attempt to analyse fully all of the quotations from the *Restatement.* The principal ones are contained in foot-note 3. Even a casual reading of the same shows that they are explicitly *predicated* and *conditioned* upon the fact that a *"consensual relation"* existed between the parties, one of whom is seeking contribution. As stated in the majority opinion, *Restatement, Judgments,* section 109, states it is based upon the principle of section 107 and *operates under the same circumstances.* Section 107 sets forth with certainty the circumstances under which it operates. It begins by saying: "In an *action for indemnity* between two persons * * *," (the present case is not one for indemnity), and continues, *"Distinctions and limitations.* The rule stated in this section deals with the effect of a judgment in an action * * * by a person injured by a tort *upon a subsequent action* between indemnitor and indemnitee for *indemnity.* * * * *The rule stated in this Section applies only to subsequent actions for*

*indemnity.* It does *not* apply to *other* actions between the indemnitor and indemnitee even with reference to the same transaction or subject matter." (Emphasis supplied). It is obvious that these sections are intended to apply only to *subsequent* suits between indemnitor and indemnitee where the indemnitee has derived his right to indemnity or contribution as the result of a consensual relation between the parties. The majority ruling, however, is broad enough to include utter and complete strangers, such as defendants in a multi-car collision who have never seen each other before, and between whom there has never been a *consensual* relation.

The majority opinion cites Maryland Rules 315 e 3, and 605 d, as partial authority for the ruling. Rule 315 e 3, had no application to situations such as here involved prior to the filing of the opinion. It applied to third party practice. National was not impleaded as a third party defendant, nor was a cross-claim filed by Sudbrook against National. Rule 605 d, may or may not apply later, but it has no bearing on the question that has been decided by the majority of the Court. Also the majority opinion fails to discuss or analyse any citation of authority by the appellees on the reargument.

Having been somewhat critical of the majority ruling, it behooves me to set forth how I think the case should have been decided, which I shall now do.

While the facts of the case present a rather unusual situation (the plaintiff below being the only appellant), the text writers and cases have dealt with the same principles that are here involved. In Vol. 1, *Freeman on Judgments,* sec. 412, we find the following pertinent statement:

> "The fact that a person was a party to an action in its earlier stages does not bind him by the judgment, unless he was also a party *when it was rendered.* If he, by permission of the court, withdraws from the action or is dismissed from it, so that he is no longer a party, then the power of the court over him terminates, and a judgment subsequently entered cannot affect his interests, though he may be bound by it as to his codefendants, whom he was

bound to *indemnify. Persons as to whom a nonsuit was granted before a judgment on the merits was rendered are not concluded by it;* neither can they claim the benefit of it." (Emphasis supplied.) [1]

The facts in the case of *Pinnix v. Griffin* (N. C.), 20 S. E. 2d 366, are strikingly similar to those in the present case. The plaintiff, Pinnix, sued C. D. Griffin and the Gate City Life Insurance Company (Company) for the alleged wrongful injury and death of the plaintiff's intestate, when he was struck by an automobile owned and driven by the first named defendant, who was employed by the other named defendant. On the first trial, there was a judgment of nonsuit as to the corporate defendant rendered at the conclusion of the plaintiff's evidence, and a verdict was found, and judgment entered, against Griffin. The plaintiff appealed the judgment of nonsuit, and the Supreme Court of North Carolina reversed. When the case again came on for trial, the Court submitted to the jury all of the issues presented at the first trial: negligence; master and servant; contributory negligence; and damages. The defendant, Company, offered a prayer that would have instructed the jury that they, in no event, could award damages in excess of those given against Griffin in the first trial. This prayer was refused. The Supreme Court held that the submission of the issues to the jury was correct, but the failure to grant the defendant's prayer

---

1. The majority opinion makes no reference to this important section of *Freeman, Judgments,* or the citations thereunder, but refers to certain broad general principles in sections 444 to 450, inclusive. The limitations to these broad principles are enumerated in section 448, where we find: "The judgment is binding on the covenantor, indemnitor or person liable over because his * * * relation to the indemnitee is such as to *impose upon him the legal obligation to defend,* assuming an adequate opportunity is given him to do so. It would seem therefore that the rule [enunciated in the majority opinion] extends *only* to those cases *wherein such an obligation to defend arises.* * * * A Third party *cannot* be called upon to defend an action, where his showing himself not to be liable will not necessarily result in a judgment in favor of the party asking him to defend." This is exactly the case of Sudbrook and National in the case at bar.

was reversible error. During the course of its opinion, the Court said:

> "When the trial court sustained the motion of nonsuit as to the appellant in the first trial it had no connection with the subsequent proceedings of the court. It had no opportunity to be heard on the issues presented and its rights are not decided by the verdict. Therefore, it is not estopped by the judgment from undertaking to minimize the damages and to contest the amount to be awarded."

A case decided by the Supreme Court of the United States, *George A. Fuller Co. v. Otis Elevator Co.,* 245 U. S. 489, also, illustrates the point under consideration. Suit was brought by the petitioner to recover indemnity for a judgment that it had to pay in pursuance of the decision in *George A. Fuller Co. v. McCloskey,* 228 U. S. 194. McCloskey, the plaintiff in the former suit, was injured upon an elevator through the negligence of one Locke, the man in charge of it. He was at work for the Mackay Company, which was doing some painting under a subcontract with the defendant, the petitioner, which, it was held, as between the parties then concerned, made the defendant answerable for Locke. The petitioner had constructed an office building under an agreement with the owner, Hibbs. The Otis Elevator Company had put in the elevators, also under an agreement with Hibbs, and furnished the man Locke upon a somewhat vague understanding with the petitioner, which, the latter contends, left Locke the servant of the Elevator Company as between the parties in the present case. The Elevator Company had been joined as a party defendant in the first suit, but a verdict in its favor had been directed by the court below. The Supreme Court observed that if the Fuller Company were right in its contention that the primary duty rested on the Elevator Company, it (Fuller Company) could recover in this second suit, unless the former proceedings constituted a bar.

At the trial in the court below, there was evidence sufficient to show that the Elevator Company retained its control at the time of the accident, and the jury found a verdict for

the plaintiff, but the judgment was set aside by the Court of Appeals on the ground that although the former judgment did not make the matter *res judicata* it concluded the case: "In view of the adjudicated facts, which were not open to the consideration of a second jury, there was no such primary liability on the part of the Otis Company as will support an action for indemnity." The Supreme Court reversed the Court of Appeals and, in doing so, said:

> "But there were no facts, whether adjudicated in the former case or not, that were not open to the consideration of the jury in this. *The Otis Company was joined as a party defendant, it is true, in the former action, and a verdict was directed in its favor.* But even if the former verdict against the petitioner had gone on the same issue that was tried in the present case, which was not the fact, it could not have concluded the petitioner in favor of the Otis Company, for the reason, if for no other, that the Otis Company was dismissed from the suit before the petitioner's evidence was heard." [2] (Italics supplied.)

I think the authorities cited, justice, and reason impel a ruling that the amount of damages (except as to the ceiling, which will be mentioned later) is not *res judicata*. When National's motion for a directed verdict was granted, it could no longer participate in the trial. It had no right to offer evidence or prayers, to participate in the argument to the jury, or to file a motion for a new trial or a *remittitur*. Under these circumstances, it is inherently unfair to, and places an undue burden upon, a litigant to require that he forego a request for a directed verdict, or suffer all of the possible consequences. If he fails to make the motion, he may find himself in the position of having an unjustified jury verdict

---

2. Other cases agree. See *Watts v. Lefler* (N. C.), 140 S. E. 435; *Continental Ins. Co. v. Seaboard Air Line Ry.* (S. C.), 90 S. E. 318; *Cadsden v. Crafts* (N. C.), 95 S. E. 610. Cf. *Hackett v. Hyson* (R. I.), 48 A. 2d 353.

against him. On the other hand, if he makes the motion and it be granted, his codefendant or codefendants may not have properly prepared the case for presentation, or being financially irresponsible, they may have little interest in its outcome. . I would, therefore, hold that the issue as to the amount of damages suffered by the plaintiff, for which National may be responsible, should be submitted to the jury at the new trial. Cf. *Brotman v. McNamara,* 181 Md. 224, 233, 29 A. 2d 264, wherein former Chief Judges Bond and Marbury advocated a new trial on all issues against all defendants, where one of the defendants had taken the appeal. It may be noted Chief Judge Marbury sat in the *E. Coast Lines* case, *supra,* but failed to dissent.

In the case of *E. Coast Lines v. M. & C. C. of Baltimore,* 190 Md. 256, previously mentioned, tort actions against two defendants were involved, E. Coast Lines, the original defendant, having interpleaded Baltimore City as a third party defendant. After verdicts were directed in favor of the City, judgments were rendered against the other defendant. This latter defendant settled the judgments and received a release, reserving its right to contribution against the City. The plaintiffs *and E. Coast Lines* appealed from the judgments in favor of the City; and these judgments, based upon directed verdicts, were reversed and a new trial awarded. This Court held that the defendant, who had settled the judgments, was entitled to contribution, if the jury on the new trial rendered a verdict against the City because of its negligence; and directed that this question be submitted in the form of a special verdict, and, if the jury did render such a verdict, the trial court should enter a judgment of contribution for one-half of the amount of settlement. This action did not leave open the amount of damages on the new trial. However, this question was neither raised nor argued. A reading of the briefs in the case discloses no complaint as to the size of the judgments rendered by the first jury, nor any request, that, in the event of a reversal, the City be afforded an opportunity to minimize the damages. Clearly, the real issue between E. Coast Lines and Baltimore City was the negligence, *vel non,* of the City, and both parties were willing to have their rights

settled by a determination of that issue. I find no *ruling* in that case that is in conflict with any suggested herein.

What I have said above concerning the issue of the amount of damages in this case, ordinarily, would also apply to the issue of negligence. But here the negligence of Ogle, for all practical purposes, is conceded, although this will not be the case in many future trials. Ogle testified that he ran his truck over to his left-hand side of the road and collided with the bus operated by Keitz; and that Keitz did nothing that was careless or negligent. National does not contend that it has testimony to refute Ogle's. Under these circumstances, I think it would be futile to require the jury again to pass upon Ogle's negligence.

There is one further matter that should be considered. Is the amount of the verdict rendered by the first jury a ceiling to limit the amount of a possible verdict against National on the new trial? Although it involves an apparent violation of the doctrine of mutuality of estoppel, the rule is general and well settled that where the liability, if any, of a principal or master to a third person is purely derivative and dependent entirely on the principle of *respondeat superior,* as it is in this case, a judgment on the merits in favor of the agent or servant, or even a judgment against him, in so far as it fixes the maximum limit of liability, is *res judicata* in favor of the principal or master, though he was not a party to the action.[3] 35 *Am. Jur.* Supp., *Master and Servant,* Sec. 591; Annos., 112 A. L. R. 405, 141 A. L. R. 1169; *Rest. of the Law, Judgments,* sec. 96 (b), and Ill. (3); 1 *Freeman, Judgments,* 1031; *Pinnix v. Griffin, supra.*

I would hold that if the jury determines at the new trial that Ogle was acting as National's servant at the time of the collision, the amount of their verdict should not exceed the amount of the verdict rendered at the first trial.

Summarizing, at the new trial I think the issues to be submitted to the jury should be: (1), Was Ogle acting as the

---

3. No opinion is expressed concerning this rule, in so far as it relates to punitive damages. Anno. 141 A. L. R. 1171. Cf. *Nance v. Gall,* 187 Md. 656, 50 A. 2d 120.

servant of National at the time of the accident?; and (2), If so, what is the amount of money, not to exceed $70,000, that the plaintiff is entitled to recover against National, as a result of the injuries sustained by the plaintiff?