HOBDEY ET UX., ET AL *v.* WILKINSON ET UX.

[No. 86, October Term, 1953.]

518

*Decided February 11, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Robert S. Caviness* for the appellants.

*David E. Betts* and *Charles W. Prettyman* for the appellees.

SOBELOFF, C. J., delivered the opinion of the Court.

Questions as to the law of joint adventures and partnership, and as to pleading in equity, are raised by this record. For an understanding of the issues a somewhat detailed recital of the facts is unavoidable.

In January 1946 Ernest L. Wilkinson and wife (the appellees) and Orrice L. Murdock, a licensed real estate broker, entered into an oral agreement to engage in a real estate development. The agreement was never precisely and comprehensively reduced to writing but its

terms may be gathered, in part at least, from a written instrument signed by the appellees and Murdock on August 27, 1948, when they endeavored to settle certain disputes which in the meantime had arisen between them. In that writing the earlier oral agreement is repeatedly referred to as a "joint adventure". Here we learn that the 1946 arrangement was for the Wilkinsons "to supply the capital for said adventure in an amount to be determined from time to time by them and Orrice L. Murdock was to supervise the purchase of the necessary lots and act as general contractor for the supervision and construction of whatever number of homes and dwellings were decided upon by Ernest L. Wilkinson and Alice L. Wilkinson and that the profits and losses were to be shared equally."

Pursuant to their understanding, Murdock negotiated for the purchase of a piece of land in the Kensington area in Montgomery County. It was paid for with appellees' money and title was taken in their names. Murdock supervised construction, and at least some of the contracts for materials were made in Murdock's name. There was no arrangement for Murdock to be paid any determined price to erect houses on the land, as would normally occur when an owner deals with a building contractor. Nor was there any agreement to pay Murdock a fee for his services in supervising construction or any brokerage for sale of the houses. Up to a certain point, when losses became imminent and appellees and Murdock quarrelled, they turned money over to him as needed, and he paid construction bills as they came due. Murdock apparently advanced some money of his own, but the amount is sharply in dispute between him and the Wilkinsons.

In all, seventy houses were built. Sixty-eight were sold and conveyed. The record indicates that the printed form of sales contract used in each instance had the name of O. L. Murdock at the top, and contained provision for a signature above a line bearing the printed words "O. L. Murdock, Agent". The form provided a

place for ratification by the "Purchaser" and by the "Seller" and "Wife of Seller". The appellees' names appear nowhere in the form.

In actual practice the sales contracts were signed by Murdock in the space intended for the "Seller", and no signature was customarily sought or obtained from the appellees. The body of the sales contract reads as a broker's form and provides for payment of commissions to O. L. Murdock, but it is clear that no commission was ever paid or agreed to be paid by or demanded of the appellees. The equal sharing in profits and losses, it is conceded by both sides, was the controlling arrangement as evidence in the written agreement of 1948.

As Mr. Wilkinson was away from home for long periods the practice was adopted for the appellees to sign deeds and to leave them with Murdock. Wilkinson testified that Murdock's instructions were to deliver such deeds to the purchasers at date of settlement upon payment of the full purchase price in cash. The record fails to disclose any instance of the appellees formally ratifying a sales contract by signing same; but ratification of contracts without signature by appellees may be presumed from their turning over signed deeds to Murdock. The standard price was controlled by the Federal Housing Administration, which had established priorities governing sale of the houses, and in instances where extras were furnished the additional price was arrived at by negotiation between the purchasers and Murdock, never with Wilkinson.

The last two of the seventy houses were sold to the appellants who were employed by Murdock as salesmen on this very project. The present litigation concerns the contracts for the sale of these two houses.

In accordance with customary practice in the sale of houses in this project Murdock signed the sales contracts with the appellants. They made the down payments to him, as the sixty-eight other purchasers had done. The appellants had seen contracts with other purchasers made in the same way; they had in fact

been salesmen in some of these transactions and were thus familiar with the procedure that was followed.

Appellants swear that when they made their payments they were actually of the belief that Murdock was the owner of the entire operation, and there is no reason to doubt their statements. Murdock supports them in his testimony; he says appellees never questioned the finality of the contracts he made in his own name with the numerous other purchasers. There is no evidence to the contrary. Appellees' names never appeared on any of the seventy contracts, their names were never mentioned in any advertising. While, according to Murdock, Wilkinson on several occasions asked for and received lists showing deposits he never challenged any contract signed by Murdock, although he knew that he (Wilkinson) had signed none either as contracting seller or to ratify Murdock's sale. Copies of the contracts were customarily sent to the Title Company and not to appellees, and it does not appear that appellees ever asked for copies of the contracts or challenged in any way any of the contracts made by Murdock.

Appellants were permitted by Murdock early in 1948 to take possession of the houses they respectively had purchased. These houses being not quite finished, they proceeded to finish them and to make improvements, not suspecting that Murdock had any less authority to deal with these houses than he appeared to have in respect to the other houses in the development. Appellants' open and notorious possession from January to October 1948 was not challenged by appellees but appellants were permitted to remain in possession and to spend money for improvements. Months later, on October 9, 1948, the dispute between appellees and Murdock coming to a climax, the appellants were ordered by the appellees to quit the premises. Appellants then obtained the deeds from Murdock or his secretary and recorded them with the avowed purpose of preventing eviction of their families, although it is not denied that the purchase price had not been fully paid.

Later each of the appellants went to the Title Company to make settlement, but they claimed certain credits which the Title Company under advice from the appellees rejected. The appellant Hobdey demanded a discount of $450.00 allowed him by Murdock under the following circumstances: When appellees stopped their payments to Murdock, the latter, needing working capital for the building project, offered to accept $1,500.00 for the balance of $1,950.00 then still owed by Hobdey. Accordingly, appellant Hobdey paid $1,500.00 in advance of the normal time and before completion of the house. Certain credits also were claimed by appellant Stone, for commissions acknowledged by Murdock to be due. It is not clear from the record how much of this is for services in connection with the Wilkinson-Murdock development, and how much for brokerage services rendered by Stone to Murdock in respect to business in which Wilkinson had no interest.

Wilkinson brought suit in the Circuit Court for Montgomery County to have the cloud removed from his title. The appellants filed no cross-bill but in their answer prayed relief by way of specific performance of the contracts on the theory that Murdock made them as joint adventurer or partner on behalf of the Wilkinsons as well as for himself.

After testimony, the Court declared the deeds to appellants null and void. It found, moreover, that there was no joint venture between appellees and Murdock. The trial court referred the case to an auditor to state an account between the parties. The order of reference directed that Hobdey and Stone be credited with amounts advanced on the purchase price before they received notice from the appellees that Murdock was not authorized to act. However, the decree excluded any credit or reductions in purchase price offered by Murdock or for commissions owed by him to appellants. Under the order appellees were declared entitled to compensation for occupancy of the premises, but no mention was made of the considerable improvements made by both

appellants prior to their actual notice of Wilkinson's record title. It is from this decree that appellants bring their appeal.

At the threshold of our consideration of this case is a motion to dismiss the appeal. This motion was argued together with the appeal itself. Two grounds are specified in support of the motion to dismiss. One of the asserted grounds for dismissal is that the appellants in their brief "have abandoned their previous claim that the lower Court was in error in voiding the deeds in question."

The second ground advanced for dismissal is that the appellants are here seeking for the first time specific performance of the two contracts mentioned, although (according to the appellees) this question was never properly before the trial court.

Quite plainly the appellants concede in their original brief and reply brief that the deeds should have been voided because when the appellants obtained and recorded them the purchase price had not been fully paid. If we were to take this concession literally, disregarding all else, we should have no alternative but to dismiss the appeal. Actually, while the appellants make this concession, they claim to be entitled to cross-relief (although this claim is made in their answer and not by way of cross-bill) and cross-relief if granted would set up again the voided deeds or substitute new deeds having the same effect as the old.

The general rule of equity pleading is that a defendant who seeks affirmative relief must file a cross-bill; *Cramer v. Baugher*, 130 Md. 212, 219, 100 A. 507; but to this rule there are recognized exceptions, and one of these is a claim for specific performance, which may be prayed in the answer to the bill; *Miller* on *Equity Procedure*, p. 244. Justice requires that the question of the appellants' right to specific performance be dealt with in this case. We are not disposed to extend the technical requirement of a cross-bill beyond its present limits, particularly when the very language embodied in the

answer is that which would constitute a cross-bill if so denominated as a separate paper. We hold that this question was sufficiently raised by the pleadings and was properly before the Chancellor, and is now before us.

The Chancellor was clearly correct in holding that Murdock had been held out by appellees as having authority to accept down payments and that the appellants should therefore be protected in the amount of any advances made by them to him on the purchase price. We think, however, that the Chancellor should have gone further and that the appellants should also be protected in their status as purchasers under the contracts Murdock made with them coincidentally with the payment of these deposits. Merely crediting them with their deposits and nullifying the purchase agreements would not do them complete justice. There is no suggestion in the record of fraud or collusion between the appellants and Murdock. Appellees held him out as authorized to sell, and there is no reason to infer that the appellees did not intend that he should sell the two houses as he had sold all the others. In this situation equity requires that the appellants and their families be not disturbed, but that they be permitted to continue in possession and be invested with title if they are willing to pay the amount found to be due by them under their contracts.

The description of the relationship between the appellees and Murdock as a "joint venture"—a term which they adopted and seem to have used quite deliberately in their 1948 written agreement—is not necessarily conclusive as to its legal character. Sharing profits has likewise been held not a sure touchstone. *Brenner v. Plitt,* 1943, 182 Md. 348, 34 A. 2d 853. Nor is even the fact that they agreed to share equally in losses as well as profits. *Brenner v. Plitt, supra.* But the self-characterization of the parties as "joint adventurers", and their agreement to share both profits and losses, coupled with the evidence of a course of conduct which the appellees permitted Murdock to engage in with respect to this real estate development strongly indicate

a joint adventure, which is really in law a partnership for a single transaction or for a limited number of transactions. *Southern Can Co. v. Sayler*, 1927, 152 Md. 303, 136 A. 624; *Atlas Realty Co. v. Galt*, 1927, 153 Md. 586, 139 A. 285. See also *36 Virginia Law Review* 425. The legal consequence flowing from this relationship would be that one member of the joint adventure could bind the others. In this case we think Murdock acted not beyond his authority in making contracts of sale to the appellants; but aside from technical questions of joint adventure or partnership, and on familiar principles of agency and estoppel these appellants were entitled to rely on Murdock's apparent authority to make the sales contracts, because appellees created or tolerated the appearance. One who knowingly permits another to act for him as though authorized, inducing third persons to rely to their disadvantage on the seeming authority, is estopped from later asserting the lack of authority of his apparent agent. This Court has recently said: "As between a principal and his agent, the scope of the agent's authority may be limited by secret instructions and restrictions; but as between the principal and third persons, the mutual rights and liabilities are governed by the scope of the agent's apparent authority, which is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses and which the principal is estopped to deny." *Penowa Coal Sales Co. v. Gibbs & Co.*, 1952, 199 Md. 114, 119, 85 A. 2d 464, 467. This conclusion is not affected by any constructive notice of ownership with which appellants may be charged from the land records showing title in appellees. It was not inconsistent with ownership for appellees to permit Murdock to contract for the sale of houses in this development; and by consistently honoring such contracts the appellees evidenced that they sanctioned the practice.

We are further of the opinion that appellees must recognize the credit of $450.00 granted by Murdock as a discount for cash since as a joint venturer or partner

he could bind the appellees who held him out as such to the appellants. The sales commissions claimed by the purchasers as an offset should not be allowed unless they were earned by services rendered to this venture. No personal debt of Murdock arising from unrelated matters should be charged against appellees. This is a phase of which the record is not clear, but it can be made free from doubt by further testimony, if necessary.

As we hold the appellants entitled to specific performance the question of an allowance to them for improvements to the property becomes academic, as does the question of an allowance of rent for occupancy of the premises. The adjustment of taxes, etc. should be made as is customary in real estate settlements, with due allowance of interest to appellees for the unpaid purchase money.

The views herein expressed relate to the controversy between the parties to this case; they can have no binding effect upon the appellees or Murdock in respect to their separate controversy, and we intimate no opinion as to the latter for it is not before us.

The motion to dismiss will be denied and the decree of the Circuit Court for Montgomery County will be reversed with directions to pass a decree in accordance with the views expressed in this opinion.

*Decree reversed with costs to appellants,*
*and directions for entry of decree*
*consistent with the views expressed*
*in this opinion*