542 A.2d 1292

**Warren Robert LESCH, et al.**

v.

**CHEVRON, U.S.A., INC., et al.**

**No. 1151, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

July 7, 1988.

670

Glenn E. Bushel (Ira L. Oring, Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., all of Baltimore, H. Patrick Stringer, Jr. and Mudd, Harrison & Burch, Towson, on the brief), for appellants.

Donald E. Sharpe (Rosewin Sweeney, Elizabeth C. Kelley, Piper & Marbury, David D. Patton and Bossard & Patton, on the brief), Baltimore, for appellee, Chevron, U.S.A., Inc.

Richard L. Flax (Charles N. Ketterman, Susan A. Polis and Donahue, Ehrmantraut & Montedonico, Chartered, on the brief), Baltimore, for appellee, Bay Oil, Inc.

Argued before GILBERT, C.J., and BISHOP, J., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

W. ALBERT MENCHINE, Judge, Specially Assigned.

Warren Robert Lesch, M.D. and Margaret Marie Lesch (Dr. Lesch, Mrs. Lesch, or the Lesches)[1] filed an action in the Circuit Court for Harford County against Chevron

---

1. On amendment by interlineation, Maryland Casualty Company was added as a use plaintiff.

U.S.A., Inc. (Chevron) and others.[2] By amendment, Bay Oil, Inc. (Bay Oil) was made a co-defendant.

The several counts of the complaint against Chevron, as amended, alleged: (I) negligence of its actual or apparent agent; (II) strict liability; and (III) breach of warranty.

The several counts of the complaint against Bay Oil alleged: (IV) negligence of its actual agents; (V) strict liability; and (VI) breach of warranty.

Loss of consortium against both Chevron and Bay Oil was alleged under count VII.

Chevron and Bay Oil filed separate motions for summary judgment. The trial court, by a single order dated August 4, 1987, granted both motions. The order extended final judgments in favor of those two defendants.[3] The Lesches have appealed.

The test for our review in such cases was succinctly stated in *Washington Homes v. Inter. Land Dev.*, 281 Md. 712, 717–18, 382 A.2d 555, 557–58 (1977):

"In reviewing the propriety of the trial court's action on a motion for summary judgment, the appellate court is concerned with whether there was a dispute as to any material fact, and if not, whether the moving party was entitled to judgment as a matter of law. In considering the matter, the duly shown facts which would be admissible in evidence and all reasonable inferences deducible therefrom must be considered in a light most favorable to the party opposing the motion and against the party making the motion. *See Rooney [v. Statewide Plumbing & Heating General Contactors, Inc.]*, 265 Md. [559] at 563–564 [290 A.2d 496 (1972)]; *Shatzer [v. Kenilworth Warehouses, Inc.]*, 261 Md. [88] at 95 [274 A.2d 95

---

**2.** The action joined Walker's Chevron, Inc. (a branded station of Chevron) and Malcolm H. Weeks in the original complaint.

**3.** The action had joined Walker's Chevron, Inc. and Malcolm Weeks in the original complaint. Neither was affected by the trial court's judgment below. The trial court expressly determined in the written order that there was no just reason for delay. Maryland Rule 2-602.

(1971) ]; *Brown [v. Suburban Cadillac, Inc.]*, 260 Md. [251] at 255 [272 A.2d 42 (1971) ]."

So viewed, the "pleadings, depositions, answers to interrogatories, admissions and affidavits" (Maryland Rule 2–501) demonstrate the existence of admissible evidence legally sufficient to establish the following:

On July 14, 1985 Dr. Lesch had observed "a metal rod lying in the ... highway ... swerved to avoid the rod but obviously did not. The left rear wheel hit the end of the rod, causing it to elevate, and hit against the gas tank." He first noted leaking gas after putting the car in the garage that day. The car was pushed from the garage and the driveway and garage hosed down until all luminescence and odor had disappeared. The car was left outside overnight and the garage door left open.

On July 15, 1985, Dr. Lesch reported by telephone to co-defendant Walker's Chevron, Inc. (Walker's Chevron) that gasoline was leaking from the gas tank of his motor vehicle. Co-defendant Malcolm Weeks (Weeks) arranged to have the vehicle towed to the service station. Neither Walker's Chevron nor Weeks are parties to this appeal.

Dr. Lesch talked to Weeks and was informed that repairs "would involve usually three things. He could repair it, if it was a small hole; it would require welding, if it was a larger hole; and it would need replacement if it was a big large hole." Weeks later told Dr. Lesch "I have fixed your gas tank." He had "fixed" the leak by wrapping air conditioner tape around a wood screw and inserting it into the gas tank. He then sealed the area with a mixture of epoxy substances.

The automobile was returned to Dr. Lesch's possession on July 16, 1985 and was driven between 50 and 70 miles that day. Checks for gasoline leakage were made on the afternoon and evening of that day at 1:00, 5:00, 5:30, 6:00, 7:30 to 8:00, and 9:30 to 10:00. No leaking had occurred on any of those inspections. The vehicle then was garaged.

The home of the Lesches was a ranch-style house, with the garage and basement on the first level, the living quarters above. On the morning of July 17, 1985 Mrs. Lesch noticed an odor, told Dr. Lesch, and both descended to the basement area, then moved through a door into the garage. The basement light switch was already on when the descent was made, but there was no light in the garage itself. Dr. Lesch carried a flashlight because he was "aware of a faint, but definite, maybe a little greater than faint, but a definite odor of gasoline." He lifted the garage door to get more light, retraced his steps so he "could see better under where the tank was" and saw "a little puddling of gasoline in the gas tank area." He said that "... at that moment the garage door triggered the light going on, and there was an instantaneous explosion."

Dr. Lesch sustained second degree burns on 45% of his total body surface. Mrs. Lesch sustained second and third degree burns on 45% of her total body surface. The dwelling and all its contents were destroyed in the ensuing fire.

### The Case As To Chevron

The appellants do not contend that *actual agency* has been shown as to Chevron. Their claim against Chevron is grounded solely upon *apparent agency* liability.

In the course of an oral opinion, the trial judge said:

"The case appears to me to fall squarely within the facts as presented by *BP Oil Company [Corporation] vs. Mabe*, decided by the Maryland Court of Appeals, 279 Md. 632 [370 A.2d 554 (1977)]. Based upon all facts that I have before me and taking the inferences drawn therefrom in the light most favorable to the Plaintiff, I do not believe there is any basis to conclude Chevron made any representation to the Plaintiff, and that the Plaintiff did not, in fact, rely upon any representation made by Chevron. A reliance by the Plaintiff upon the facts as presented did not constitute reasonable and justified reliance upon any apparent agency relationship between Chevron and Walker.

"I therefore conclude that the Motion for Summary Judgment as to Chevron should be granted."

We agree that *Mabe* fixes the standards by which apparent agency liability may attach in this State. We shall hold, however, that the admissible evidence and the reasonable inferences arising therefrom as shown in the documentary evidence required to be considered under Rule 2–501 would *permit* a trier of facts reasonably to conclude that apparent agency has been shown. In short, we conclude that the deficit of evidence delineated by Judge Smith in *Mabe* has been supplied in this case.

In *Mabe, supra,* Judge Smith said for the Court of Appeals:

"One thing upon which the parties here can agree is that the law applicable to such an agency is that stated in Restatement (Second) of Agency § 267 (1958):

'One who represents that another is his servant or other agent and thereby causes a third person justifiably *to rely* upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.' (Emphasis added.)

"Restatement of Agency § 267 (1933) is identical to the above. Two Maryland cases are cited in the annotations to it, *Pennsylvania R.R. v. Hoover,* 142 Md. 251, 120 A. 526 (1923), and *Pugh v. Washington Ry. & Elec.,* 134 Md. 196, 106 A. 522 (1919), 279 Md. at 643, 370 A.2d at 560."

Judge Smith thereafter in *Mabe* cited and commented upon 1 F. Mechem, *Law of Agency* § 245 (2nd ed. 1914):

" 'Estoppel is always a matter personal to the individual asserting it and he must therefore show that he was misled by the appearances relied upon. It is not enough that he might have been, or that some one else was, so misled. It must also appear that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts

that should have put him on his guard is not enough.'
*Id.* at 177–78.

"The cases we have examined seem to be uniformly in agreement with the statements in the Restatement and Mechem to the effect that for there to be liability in a case such as this there must be actual reliance upon the part of the person injured."

279 Md. at 644–46, 370 A.2d at 561.

Judge Smith carefully delineated the indicia of authority in *Mabe* as follows:

"The service station in question was painted yellow and green, said to be the BP colors. There was a large BP sign on a pole hanging over the station; BP insignia appeared on the gasoline pumps; there was a tow truck present with a BP sign on it, and the attendant in question wore a uniform with yellow and green BP emblems on his jacket and cap.

"The service station building was leased by the owner to Faison. He leased it to BP who in turn leased it back to Faison. Gasoline tanks, pumps and signs were owned by BP. Under the agreement between Faison and BP, Faison was required to "furnish, install and display continuously on the exterior of the station at a point visible and accessible to the public, a legible sign showing that [he was] occupying said station under a lease and [was] the sole owner of the business." Mabe was asked by his attorney whether there was "any sign up that said anything about being operated by anybody other than BP," to which he replied in the negative. The record is otherwise silent as to such a sign."

279 Md. at 634–35, 370 A.2d 556.

"Faison was paid no salary or commission by BP. Any employees were hired, fired, and paid by him. He was required to make no reports to BP relative to his sales and service operation. He paid his own sales and other taxes. BP had no control over the hours of station operation, the hours of operation being fixed by Faison. Faison paid cash on delivery for that which he bought. If

he did not have the money to pay, he did not obtain the product. He provided his own uniforms and said that BP never told him that he had to wear a uniform of any kind."

279 Md. at 635–36, 370 A.2d 557.

Judge Smith then detailed the evidence relating to reliance by *Mabe:*

"Mabe's reasons for entering the station in question were set forth in the following testimony on direct examination:

'Q Why did you choose the BP station?

'A Because I always buy BP gasoline, always deal with BP.

'Q Had you dealt with BP before?

'A Yes, up on 29th Street and Greenmount Avenue. I [sic] was right around the corner from where I lived at.

'Q How often had you dealt with them?

'A I had been dealing with them for around about a year at that time.

'Q Was there anything in particular you—attracted you to the BP station on Hilton Street?

'A Nothing except for the BP station, had BP signs, BP gas, BP pumps."

*"Although his brother twice said that reasons for entering this station were "the happy motoring sign" which he said "is a slogan and it means that there's good service," it was not actually established that such a sign, the sign of one of BP's competitors, was on the premises."*

279 Md. at 636, 370 A.2d 557 (emphasis added).

The Court in *Mabe* then concluded:

"Because there is no evidence of any kind of reliance on the part of Mabe and no evidence of actual agency, Judge Dorf properly granted the motion for judgment N.O.V."

279 Md. at 649, 370 A.2d 564.

The procedural history of the appeal in *Mabe, supra,* demonstrates that the issue whether the evidence would

have permitted a finding by the trier of facts that the service station operator was the apparent agent of BP Oil was troublesome and difficult of ascertainment. The *Mabe* case was first argued before a five judge Court but failed to produce a decision. Reargued before a seven judge Court, the case produced a dissent by the late Judge Levine.

In the subject case, we believe that the evidence in this record leaves no ground for doubt that all elements essential to proof of apparent agency may be found by the trier of facts. We explain.

### Indicia of Apparent Authority

Determination of the issue whether the decision in *Mabe*, *supra,* compels affirmance of the judgment below or whether the evidence would *reasonably permit* the trier of facts to conclude that this is *Mabe* revisited and deficit supplied, requires careful consideration of the reasonably permissible findings of facts in the two cases.

In the subject case there is evidence from which it reasonably may be inferred that Chevron followed a course that was *intended* to assure that company operated and branded stations would be indistinguishable in the public mind. This is demonstrated by the following excerpt from Chevron's Station Acquisition Manual of March 1984.

An important factor in the Company's willingness to brand a retail outlet is the physical appearance it will present. In our industry, *a branded station has become a visual statement to the world about our products and services.* Hopefully, each branded station enhances our reputation in the community. Chevron's retail identification system was conceived and implemented to establish a positive appearance that can be readily associated with the customer good will we enjoy. Consistent application of the system will build on our strengths and enhance our reputation in the sale of our products. Improper or inconsistent application of our identification system will undermine our program and damage our reputation.

The importance of a coordinated, attractive appearance for all branded retail outlets, wherever they are located, deserves the attention of all Marketing employees. This is equally true whether the station is owned and operated by Chevron or owned or operated by a jobber or dealer. *The public is often unable to distinguish between a jobber station and one of ours. Accordingly, we must be equally concerned with the appearance of all Chevron branded stations.*

(Emphasis added).

Similar indicia of an intentional purpose by Chevron to guide the public mind to the conclusion that the Branded Dealer is Chevron and Chevron is the Branded Dealer is to be found in the Branded Jobber Petroleum Agreement between Chevron and Bay Oil that in part here pertinent reads as follows:

"8(c) Jobber recognizes Chevron's right to use and authorize others to use all trademarks, service marks, tradenames, color schemes and service station designs (collectively "insignia") utilized by Chevron (and owned by Chevron's parent company, Standard Oil Company of California ("Standard")) to identify products *and services*, and Jobber agrees not to claim any right, title or interest therein. Jobber acknowledges the need to control Jobber's use of such insignia in order to maintain the validity of such insignia and to assure the continued recognition of, acceptance by, and high regard of the motoring public and other consumers for the products and *services identified by such insignia.*"

(Emphasis added).

Chevron's Authorization Letter to Bay Oil for Branded Retail Outlets dated 9/11/84 included the following:

"1. You shall cause the terms and conditions regarding the use of such insignia set forth in Section B of the Jobber Agreement to be complied with at the premises. * * * *"

We observe that Chevron used the imperative "shall" to *compel* Bay Oil to cause the use of such insignia at branded stations. No other insignia than Chevron's appeared on the premises of Walker's Chevron.

During the deposition of the witness Robert George Shurts, identified as a Chevron employee for 36 years who retired as liaison between the company and jobbers in Maryland and other states, it was acknowledged that he had provided Bay Oil with such a document and gave the following testimony concerning it:

"Q. Why did Chevron choose to have its jobbers provide a document of this type to service stations rather than providing it to the service stations directly?

"A. We don't have anything to do with the stations. The jobber's stations—jobbers are our only customer. I don't have anything to do with dealers.

"Q. With respect to the use of the Chevron trade name and service mark, Chevron expects the jobber to police the use of that mark by the branded service station?

"A. Correct."

This is an example of facts consciously withheld from public knowledge.

The record established beyond cavil that all the insignia Chevron believed assured "continued recognition of, acceptance by and high regard of the motoring public and other consumers for the products and services identified by such insignia" were in place at Walker's Chevron. Bay Oil had carried out Chevron's mandate.

The Branded Jobber agreement, *supra,* included the following:

"9. **Credit Cards.** (a) Chevron may, at its option, authorize the acceptance by Jobber or one or more of Jobber's customers of credit cards approved by Chevron for retail sales of the types of products and services that Chevron may from time to time designate. The honoring of such credit cards by Jobber or Jobber's customers and Chevron's acceptance from Jobber of authorized invoices

or other evidence of debt issued thereon for *sales of products and services made to cardholders by Jobber or, at Chevron's option, one or more of Jobber's customers,* shall be subject to terms and conditions established periodically by Chevron, which shall include, but not be limited to, Chevron's right to charge back to Jobber or to refuse to accept any invoice pursuant to such terms and conditions. Chevron reserves the right at any time to terminate any such authorization for the acceptance of credit cards." (Emphasis added).

Except for 12 month warranty periods after new car purchases, all repair work on the two vehicles of the Lesches was performed by Walker's Chevron, including the ill-fated repair of the gas tank on July 15, 1985. Such repair work of wide ranging character was performed by Walker's Chevron on 33 separate occasions between May 18, 1982 and July 15, 1985. The cost of such repairs totalled $2,953.66 over that period. All repair charges were paid by way of a Visa charge account approved by Chevron. Printed charge tickets provided by and bearing the imprint of Chevron, U.S.A., Inc., as shown on the following blank form, typically were used for all purchases and repair charges made by the Lesches at Walker's Chevron:

682

The billings by Visa to Dr. Lesch, identical in form as to each transaction whether for gasoline, oil, purchases or repairs, are illustrated by the following reproduction of the billing for the July 15, 1985 repair:

To avoid additional finance charge on these accounts pay "New Balance" in full by 08/27/85 the "Payment Due Date." Finance charge will Last (Cash Advance) Balance will continue to accrue until date of full payment. the amount of finance charge accrued from the "Closing Date" to the payment date will appear on your next statement.

| REFERENCE NUMBER | POSTING DATE | DESCRIPTION OF TRANSACTION | | | TRANSAC-TION DATE | SALES/LOANS/DEBITS PAYMENTS/OTHER CHARGES |
|---|---|---|---|---|---|---|
| G0441078 | 07 08 | CHEVRON | BEL AIR | MD | 06 13 | 16 00 |
| G0942021 | 07 09 | CHEVRON | BEL AIR | MD | 06 17 | 17 10 |
| G1841124 | 07 18 | CHEVRON | BEL AIR | MD | 06 25 | 19 68 |
| G1841123 | 07 18 | CHEVRON | BEL AIR | MD | 06 25 | 12 00 |
| G3138690 | 07 31 | CHEVRON | BEL AIR | MD | 07 16 | 67 00 |
| G3138692 | 07 31 | CHEVRON | BEL AIR | MD | 07 08 | 15 78 |
| G3138691 | 07 31 | CHEVRON | BEL AIR | MD | 07 11 | 20 00 |
| G3138693 | 07 31 | CHEVRON | BEL AIR | MD | 07 09 | 11 75 |

These billings in total showed payments by the Lesches of many thousands of dollars during the cited period.

Chevron's efforts to prevent the public from distinguishing between branded stations and its own outlets were of long standing and were diligently pursued. On January 23, 1976, a letter from E.A. Pfefferkorn, identified as the wholesale manager of Chevron, addressed to Bay Oil, declared, "We are offering you a new 1976 point-of-sale program incorporating a 'We Care' theme." Although the letter stated that the program was designed for dealers "whose business is gasoline and service oriented rather than a dealer whose business might be repair oriented," [4] the letter declared that *The 'We Care' program concept centers around the dealer's concern for his customers' service needs, not just the selling of his products."* (Emphasis added). The letter enclosed the following slogan:

#### "WE CARE ...

"—for you, our customer

—for your comfort

—for your safety

—for your economy!

"If at any time our service slips, remind us, because we're working hard to prove to you...

#### "WE CARE!

*"This station is dedicated to this attitude and we want to take care of your car for you, properly and efficiently, so you are happy, safe and comfortable!* Give us a try or tell us when we miss the mark, so we can keep up our promises...

---

4. That such was the design of the program was not disclosed to Chevron customers.

### "WE CARE!"

(Emphasis added).

The employees of Walker's Chevron were clothed in uniforms bearing Chevron insignia. The Chevron "Marketeer" disclosed the purpose intended by Chevron by its encouragement of such uses by branded stations. In an article headed "DRESSED FOR SUCCESS," the "Marketeer" made the following comment:

> "The current Chevron uniform program has been in effect for about 10 years, and while it has been successful, the Company believed it was time to make a change. 'We believed we needed something more fashionable and acceptable to dealers and their employees,' says Ben Smith, manager of Dealer and Consumer Affairs. 'We were looking for something that our dealers would want to wear, that would be comfortable and functional, and that would blend in with the Company image. Most of all, we wanted a uniform that would present a neat and professional appearance.'
>
> \* \* \* \* \* \*
>
> Smith believes the new uniforms will be a worthwhile dealer investment: 'Customers will have more confidence in dealers and salespeople who project a sharp, clean, professional image. The image will help build dealers' business and encourage their recognition as professionals in their communities.'"

On the basis of the totality of the above admissible evidence, might the trier of facts reasonably conclude that Chevron had adopted Omar Khayyam's studied purpose to "take the cash and let the credit go, nor heed the rumble of a *distant* drum," and in consequence have enmeshed itself in Sir Walter Scott's epigram: "Oh what a tangled web we weave when first we practice to deceive"? We think so.

### Reliance on the Indicia of Authority

#### *As to Dr. Lesch*

Dr. Lesch explained his reliance upon the evidence both in his deposition and in his separate affidavit.

In the deposition he gave, *inter alia,* the following testimony:

"Q   You mentioned earlier that the major organization was one of the reasons why you shopped at a particular service station.

"A   After the demise of Mr. Walker, it was very important to me to have a gas station that gave fairly complete service that had the back-up or was involved with a national organization, yes.

\*     \*     \*     \*     \*     \*

"Q   Did [the son, Mr. Benny] Walker, or Mr. Weeks or anyone at that station represent to you that they were being backed up by the major concern of Chevron?

"A   Inferentially on one rare occasion.

"Q   What was that?

"A   \* \* \* I had my son's old '67 Valiant out to Walker's to have some engine problems, that we took it back once or twice, and Mr. Weeks was working on it, and there were some problems that kept recurring.  And I asked [Creighton],[5] I said, not knowing that much about Mr. Weeks at the time, and having to adjust to new mechanics, after having years of faith in Mr. Walker, I had mentioned, questioning his ability is he a good mechanic, or does he know what he's doing.  And his answer was, oh, yes, he is sent to courses, or he goes to courses.  And by this I assumed or believed that this was a strong implication that he did indeed attend refresher courses or modernization courses, whatever, that were perhaps given by a national organization, most likely the one this gas station was affiliated with by its logo.

"Q   Did he tell you which organization he went to these courses?

"A   No.  He said, oh, yes, he's a good mechanic, he regularly is sent to, or has to go to, not as if it was his own volition, as if it was a requirement.

---

5.   Loy H. Creighton was identified as "Manager" on the letterheads of Walker's Chevron, Inc.

"So, I felt much more secure at that point in time, knowing that there were requirements or standards to be met by the employees.[6]

"Q    Approximately when was that conversation?

"A    I would guess it would be shortly after Mr. Walker died, when Mr. Weeks first started to work there. Which I would guess would be sometime in '80, '81, somewhere in there."

In the course of a separate affidavit, Dr. Lesch said, *inter alia:*

"Before the fire, my wife Margaret and I owned two motor vehicles, a 1977 Buick Regal and a 1973 AMC Hornet. When in Bel Air, Maryland, Margaret and I exclusively bought gasoline products, as well as serviced both of our vehicles at Walker's Chevron, located at 800 Conowingo Road in Bel Air."

He went on to explain why he did so:

"My attorneys have attached to this Memorandum as exhibit 15 copies of my VISA credit card statements for the period July, 1982—July, 1985. Whenever Margaret and I purchased gasoline or had our cars serviced in the Bel Air area, we used our VISA credit cards. We seldom, if ever, purchased gasoline or paid for car services with cash while in Bel Air, and we never used any other credit card besides our VISA card. As these credit card statements show, Margaret and I purchased only Chevron gasoline for our automobiles and had our cars serviced only at Chevron stations.

"When Margaret and I traveled outside of Bel Air, we usually paid for gasoline with cash or traveler's checks. Even when we traveled, however, whenever possible we

---

**6.**  John McGuire, general manager of the reseller division, and Robert Shurts, Chevron's liaison official, who had visited Walker's Chevron on four or five occasions, both testified that there were training programs which Chevron provided to mechanics in branded service stations.

purchased Chevron gasoline, because over the years we developed confidence in Chevron products and services.

"Margaret and I have lived in Bel Air since 1959. When we first arrived there, we patronized a service station owned by Ben Walker. In the mid–1970's, the station, located on Conowingo Road, became associated with Chevron, and became known as Walker's Chevron.

"From the mid–1970's until I last patronized Walker's Chevron in July, 1985, it was evident to Margaret and me that Walker's Chevron was associated with the national Chevron oil company. The station was known as Walker's Chevron, Inc. There was a large sign bearing the Chevron logo which was located on the parking lot of the station. The gasoline pumps had Chevron decals. The service vehicles had Chevron decals on each door. There was a Chevron emblem and slogan on the door to the service bay. There were other Chevron decals on the poles supporting the canopy over the full service island, as well as on the office desk. The gas station employees wore uniforms with Chevron emblems on them, and the gas station service tickets had the Chevron emblem on them. There was no indication at the service station that it was not associated with Chevron in any respect.[7]

---

**7.** John McGuire, general manager of the reseller division of Chevron, gave the following testimony in the course of his deposition:

"Q   Let's first limit the question to those stations that Chevron owns and operates?
"A   Okay.
"Q   Does the Chevron trademark or insignia appear any differently in those stations? Than independently owned stations?
"A   No.
"Q   With respect to those stations is the Chevron name and insignia meant to merely signify that those stations have Chevron gasoline available for sale?
"A   The only thing consistently you can associate with the hallmark.
"Q   With respect to those other stations where servicing of vehicles is provided doesn't the presence of the hallmark and the Chevron trade name signify that servicing is available in those stations?
"A   No, not in and of itself.

"Whenever we needed repairs done to our vehicles after their manufacturer warranty period expired, Margaret and I took our vehicles only to Walker's Chevron. At first, we patronized the station because we trusted the mechanic, Ben Walker. We continued to patronize the service station after Ben Walker's death in 1980, however, largely because it was evident to us that Walker's Chevron was associated with Chevron, a national oil company. The relationship between Walker's Chevron and Chevron, which we perceived to exist, became critically important because Benny Walker, Ben Walker's son and the proprietor of the station after his father's death, had no service station experience. Because of the relationship which we perceived between Walker's Chevron and Chevron, we felt comfortable that our vehicles would be repaired properly, and we thought that Chevron, together with Walker's Chevron, would stand behind any repair. We understood such a relationship to exist between Walker's Chevron and Chevron, the national oil company because the station had Chevron in its name,[8] because of the Chevron logos, signs, and trademarks located throughout the service station, and because the mechanics wore Chevron uniforms.[9] Also, Walker's Chevron identified itself as a Chevron service station in the local yellow pages.

"On July 15, 1985, for the above reasons, I contacted Walker's Chevron to request that a puncture in the gas tank of my 1977 Buick be remedied. Margaret and I

---

"Q What if anything indicates to the customer in that context that the servicing done by that station is being done by Chevron?
"A The ones we operate?
"Q Yes?
"A Nothing on the surface."
The surface was all that was disclosed to the Lesches.

**8.** In an internal memorandum it was stated: "[B]randed Chevron dealers * * * are not permitted to use our Chevron or Standard names in their incorporated names. Such use is misleading."

**9.** *See* page 684, *supra.*

chose to take our vehicle to Walker's Chevron because we were pleased with the manner in which Walker's Chevron had performed previous repairs to my vehicle, and because we relied upon Walker's Chevron and Chevron, the national company."

### As to Mrs. Lesch

In an affidavit filed in the proceedings, Mrs. Lesch said:

"I have read the Affidavit of my husband, Warren Lesch, and concur with the statements contained therein. I also observed the Chevron tradename and insignia present at Walker's Chevron, as described by my husband. Furthermore, as my husband stated, I, too, relied upon what I perceived to be a direct association between Walker's Chevron and Chevron U.S.A., a large national oil company, in deciding to have our automobiles serviced at Walker's Chevron. I perceived that the activities of the mechanics and other employees at Walker's Chevron would be controlled or regulated by Chevron to insure that the repairs which they performed to our vehicles would be done in a competent and safe manner."

We are persuaded that the evidence submitted below as to both Lesches was sufficient in law to require the issue of reliance to be submitted to a trier of fact for determination and will now pass to the question whether such reliance was reasonable.

### Reasonableness of Reliance

As we see it, the reasonableness of the Lesches' reliance that Weeks, a defendant below and an employee of Walker's Chevron, was the apparent agent of Chevron is an issue proper for determination by the trier of facts.

The testimony and exhibits produced during depositions of the witnesses Shurts and McGuire, officials of Chevron described *supra,* furnish evidence bearing upon this issue.

An internal memorandum dated September 17, 1982, directed to "Field Marketing Management Retail" explicitly stated that Chevron "has taken the position that branded

Chevron dealers * * * are not permitted to use our Chevron or Standard names in their incorporated names. Such use is misleading * * *. *If the public would be inclined to view the business as an agent of Chevron, such use would be unacceptable.*" (Emphasis added). The memorandum then called for "review of the station files" and "any other sources for branded dealers using "Chevron" in their corporate name.

In Chevron's brief, counsel argue that the memorandum was issued to "protect its trademark from infringement." That is a curious position to espouse in light of the fact that Chevron *had actual knowledge* that Walker's Chevron used "Chevron" in its corporate name at least as early as February 20, 1983 [10] and *did nothing thereafter to seek a change.*

---

10. Benny C. Walker in February 1983 had directed a letter on a matter wholly unrelated to these proceedings to one Darry Callahan, Pricing and Evaluation Manager at the San Francisco Headquarters of Chevron on the letterhead of Walker's Chevron, as shown hereafter:

**WALKER'S CHEVRON, INC.**

"COMPLETE CAR CARE"

LOY H. CREIGHTON
MANAGER

800 CONOWINGO ROAD
BEL AIR, MD 21014
838-9667,

Chevron responded on its letterhead, as shown hereafter:

The "misuse" was permitted to go on and on with its continuing possible influence upon the Lesches' conclusion that Walker's Chevron was operated "as an agent of Chevron."

We have previously cited, *supra,* an excerpt from Chevron's Station Acquisition Manual which declared that the physical appearance of a branded station was an important factor in its selection by Chevron and *"has become a visual statement to the world about our products and services"* and *"[t]he public is often unable to distinguish between a jobber station and one of ours."* We believe that the efforts of Chevron to produce such a scenario compel submission of the issue of the reasonableness of the Lesches' conclusion to the trier of facts.

---

**Chevron** U.S.A. Inc.
1200 State Street, Perth Amboy, NJ 08861

D. N. Perkins
Division Marketing Manager
Northeast Division
Marketing Department

March 14, 1983

Mr. Benny C. Walker, President
Walker's Chevron, Inc.
800 Conowingo Road
Bel Air, Maryland

Dear Mr. Walker:

It is of some significance that the internal memorandum was directed to "Field Marketing Management" and the response to the Walker letter was on a letterhead bearing the imprint of the Marketing Department.

The trier of facts well could conclude that the above recited affirmative action by Chevron, standing alone, reasonably would justify the Lesches' expressed belief. There is more.

The uniforms bore the Chevron name and insignia. We have pointed out, *supra*, that Chevron officials urged the use of uniforms "that would blend in the Company image * * * The image will help build dealers' business and encourage their recognition as professionals in their communities."

In sum, we are persuaded that the trier of facts reasonably could conclude that this case falls clearly within the principle succinctly stated by the late Chief Judge Sobeloff of the Court of Appeals in *Hobdey v. Wilkinson,* 201 Md. 517, 526, 94 A.2d 625, 629 (1953).

"One who knowingly permits another to act for him as though authorized, inducing third persons to rely to their disadvantage on the seeming authority, is estopped from later asserting the lack of authority of his apparent agent. This Court has recently said: 'As between a principal and his agent, the scope of the agent's authority may be limited by secret instructions and restrictions; but as between the principal and third persons, the mutual rights and liabilities are governed by the scope of the agent's apparent authority, which is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses and which the principal is estopped to deny.' *Penowa Coal Sales Co. v. Gibbs & Co.,* 1952, 199 Md. 114, 119, 85 A.2d 464, 467."

## The Effect of the Divestiture Act

Chevron urges us to rule that Maryland public policy is against allowing Walker's to be Chevron's agent whether in fact or in law. We decline to so rule.

Chevron's contention is grounded upon passage of the divestiture act prohibiting producers or refiners of petrole-

um products from *operating* retail service stations. Maryland Code Article 56 § 157E. The Act itself,[11] and the decisions determining its purpose and effect, compel rejection of the contention.

In *Governor v. Exxon Corp.*, 279 Md. 410, 440, 370 A.2d 1102 (1977), *affirmed*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), Judge Eldridge, speaking for the Court of Appeals, said:

> "The Maryland Act does not prohibit an oil company from owning a retail service station or having the station operated as a retail outlet for that company's products. It merely requires that the station be operated by a retail dealer rather than by company employees."

He added:

> "Furthermore, the Legislature may well have determined that discrimination against retail service station dealers and in favor of company operated stations, in the distribution of petroleum products, was an evil which could be cured by preventing producers and refiners from operating retail service stations."

---

**11.** The restrictions imposed by the statute upon "producer or refiner of petroleum products" are to be found in subsections (b) and (c) of § 157E and read as follows:

"(b) Subject to the provisions of subsection (i) of this section, after July 1, 1974, no producer or refiner of petroleum products shall open a major brand, secondary brand or unbranded retail service station in the State of Maryland, and *operate it with company personnel, a subsidiary company, commissioned agent, or under a contract with any person, firm, or corporation, managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.*

"(c)(1) Subject to the provisions of subsection (i) of this section, except as otherwise provided in this subsection, after July 1, 1975, *no producer or refiner of petroleum products shall operate a major brand, secondary brand, or unbranded retail service station in the State of Maryland, with company personnel, a subsidiary company, commissioned agent, or under a contract with any person, firm, or corporation managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.*" (Emphasis added).

The Supreme Court in *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), stated and reiterated the purpose and intended effect of the divestiture act:

> "Responding to evidence that producers and refiners were favoring company-operated stations in the allocation of gasoline and that this would eventually decrease the competitiveness of the retail market, the State enacted a law prohibiting producers and refiners from operating their own stations."

> \* \* \* \* \* \*

> "The Maryland statute is an outgrowth of the 1973 shortage of petroleum. In response to complaints about inequitable distribution of gasoline among retail stations, the Governor of Maryland directed the State Comptroller to conduct a market survey. The results of that survey indicated that gasoline stations operated by producers or refiners had received preferential treatment during the period of short supply. The Comptroller therefore proposed legislation which, according to the Court of Appeals, was 'designed to correct the inequities in the distribution and pricing of gasoline reflected by the survey.'"

437 U.S. 116, 121, 98 S.Ct. 2207, 2211.

We conclude that a statute passed by the Legislature for such a purpose and for such intended effect must not be interpreted as constituting a legislative purpose to excuse "refiners and producers of petroleum products" from liability for the wrongful acts of their apparent agents.

The statute was intended to cure what the Legislature conceived to be unfair conduct by refiners and producers. It plainly was not intended to provide an escape from liability for the negligent conduct of others acting under the apparent authority of such refiners and producers.

### Summary as to Chevron

We are persuaded that the admissible evidence presented below clearly presents issues for determination by the trier

of facts as to all essential legal elements required to be shown before liability may attach to one for the torts of its apparent agent. We summarize:

A. *As to indicia of apparent authority.*

1. Chevron's studied efforts to prevent awareness in the public mind of any distinction between Chevron and its branded stations.

2. Its ostentatious display of Chevron insignia and slogans throughout the service station, including on repair service vehicles and on the service bay door.

3. Chevron's expressed belief that the combination of 1. and 2. above creates conditions whereby "a branded station has become a visual statement to the world about our products and services," so that "[t]he public is often unable to distinguish between a jobber station and one of ours."

4. The use by Walker's Chevron of "Chevron, Inc." in its corporate title, a fact known to Chevron for some years before the present incident and not protested by it despite its stated position that such use was "misleading" and tended to incline the public "to view the business as an agent of Chevron."

5. The imprint of the actual Chevron corporate name on charge tickets authorized for all purchases and services.

6. The approval by Chevron of Visa charges in general for *all* purchases and services.

7. Its encouragements of and the actual use in Walker's Chevron of uniforms bearing the Chevron name, hallmark and slogan.

B. *As to reliance of the Lesches upon the representations of Chevron.*

Contrary to the absence of any evidence of reliance as found in *Mabe, supra,* the record below contains an abundance of admissible evidence that the Lesches relied upon the representations of Chevron, express or implied.

C. *The reasonableness of the reliance of the Lesches.*

The course followed by Chevron summarized in A. *supra, was recognized by it* as making it impossible for the public to distinguish Walker's Chevron from Chevron. The admissible evidence bearing upon the issue of the reasonableness of reliability compels submission of the question to the trier of facts.

D. *The effect of the Divestiture Act.*

The divestiture act had no effect upon the applicable law of Maryland relating to the liability of a principal or employer for the negligent acts of another causing harm to a third person when such conduct was undertaken under the actual or apparent authority of such principal or employer.

As to Chevron, we shall reverse and remand for further proceedings consistent with this opinion.

### The Case as to Bay Oil

The action against Bay Oil is predicated upon the proposition that under the facts of this case Walker's Chevron was the actual agent of Bay Oil.

We think the decision in *Keitz v. National Paving Co.,* 214 Md. 479, 134 A.2d 296 (1957), controls our decision in this case. Both appellant and appellee cite *Keitz* as supportive of their respective positions, *i.e.:*

Appellant: "The existence of an agency relationship depends upon the factual scenario of each case and the matter is normally not one for summary judgment."

Appellee: "Absent any inference of control by Bay Oil over Walker's operation of the service station, it was proper for the trial court to determine as a matter of law, that no agency relationship existed."

Although the President of Walker's Chevron disclaimed knowledge of any written lease agreement or Resellers Contract between that corporation and Bay Oil, both such documents, executed by his father in 1976, were admitted below as exhibits. Both documents contained language

extending the effect of the documents to the successors and assigns of the signatories. Ben Walker, President of Walker's Chevron, Inc., stated his belief that his occupancy of the station premises was under a "month to month lease agreement."

He acknowledged that he could not have another jobber supply him with oil and gas. He reached that understanding "as being implied at the beginning and then verified throughout subsequent phone conversations." He added that he traded under the Chevron name because it was a requirement of his oral lease. He said, "I knew that I had to buy my products from Bay Oil and to my knowledge, Bay Oil only supplied Chevron products." He believed "that there would be some advantage to having a major brand name with you."

The question posed by the Court of Appeals in *Keitz v. National Paving Co., supra,* in its preliminary holding was as follows:

"Can a servant have two masters, not joint employers, at one and the same time? This must be answered in the affirmative. A person may be the servant of two masters, not joint employers, at one time as to one act, provided that the service to one does not involve abandonment of the service to the other."

(Citations omitted). The Court then went on to say:

"Coming now to the main question involved herein, it has been stated by this Court that there are at least five *criteria* that may be considered in determining the question whether the relationship of master and servant exists. These are: (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is a part of the regular business of the employer. Standing alone, none of these *indicia,* excepting (4), seems controlling in the determination as to whether such relationship exists. The decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control*

*and direct the servant in the performance of his work and in the manner in which the work is to be done.* It will be noted from the above, it is not the manner in which the alleged master actually exercised his authority to control and direct the action of the servant which controls, but it is his *right* to do so that is important. *Sun Cab Co. v. Powell,* 196 Md. 572, 578, 77 A.2d 783 [1951]; *Charles Freeland v. Couplin,* 211 Md. 160, 169, 170, 126 A.2d 606 [1956]."

214 Md. at 491, 134 A.2d at 301.

The record shows that Bay Oil delivered the following letter, in substance an ultimatum, to Walker's Chevron:

"December 16, 1982

"Mr. Ben Walker, Jr.
T/A Walkers Chevron
Route 1 and Moores Mill Road
Bel Air, MD 21014

"Re: Bay Oil Company

"Dear Mr. Walker:

"The purpose of this letter is to advise you of certain problems regarding the operation of your service station.

"Specifically, Bay Oil Company feels that the station is not being operated in a manner which would promote the sale of adequate quantities of petroleum and related products.

"This is to advise you that if you wish to continue to occupy the premises, you will be expected to conform to the following conditions:

"1. The station will be kept clean and free of debris and trash at all times.

"2. The station will be opened seven days per week no later than 7:00 a.m. and closed no earlier than 8:00 p.m.

"3. The station will be properly lighted in a manner to give the appearance the station is open for business between sundown and 8:00 p.m.

"4. All junk cars will be removed immediately, no more than three motor vehicles shall remain outside overnight and no automobile shall remain on the premises for more than one week.

"5. You will be expected to furnish a deposit of $700.00 as security for future payments of rent.

"6. Gas will be paid for in full at the time of delivery.

"7. Monthly rent will be calculated based on the previous month's sales according to the attached schedule.

"8. We will bill you for rent at the beginning of each month. Your rent shall be due upon receipt of the bill.

"I am confident that your adherence to the above-listed conditions will improve gasoline sales and result in economic benefit to both Walkers Chevron and Bay Oil Company.

"With kindest regards, I am

"Sincerely yours,

/s/

"Garon Johnson, President
Bay Oil Company
2110 Pulaski Highway
Havre de Grace, MD 21078

"SCHEDULE OF RENT"

"SECTION 1. MINIMUM RENT. The minimum monthly rent shall be Three Hundred Dollars ($300.00) per month.

"SECTION 2. ADDITIONAL RENT. Additional rent shall be calculated on the basis of gasoline deliveries by Bay Oil Company to Walkers Chevron in accordance with the following schedule:

| Total Deliveries During Previous Month | Additional Rent | Total Rent |
|---|---|---|
| Less than 8,000 gallons | $1,120.00 | $1,420.00 |
| 8,000 to 16,000 gallons | 1,000.00 | 1,300.00 |
| 16,000 to 24,000 gallons | 880.00 | 1,180.00 |
| 24,000 to 32,000 gallons | 840.00 | 1,140.00 |
| 32,000 to 48,000 gallons | 700.00 | 1,000.00 |
| 40,000 to 48,000 gallons | 560.00 | 860.00 |

| | | |
|---|---|---|
| 48,000 to 56,000 gallons | 300.00 | 600.00 |
| Over 56,000 gallons | 0.00 | 300.00" |

We think that the content of this letter falls within the purview of point (4) of *Keitz, supra,* and, standing alone, would require submission to the trier of facts as to whether the relationship of master and servant existed between Bay Oil and Walker's Chevron. The trier of facts reasonably could conclude that Bay Oil possessed the power to control the conduct of Walker's Chevron.

JUDGMENTS REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY THE APPELLEES.